UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID KAY ELDRIDGE, RAY ELDRIDGE, JR.,  )
D. CHRIS ELDRIGE, as trustee, not       )
individually, of the C. ELDRIDGE        )
1994 GST TRUST, PATRICIA K. SAMMONS,     )
as trustee, not individually, of        )
the P.K. SAMMONS 1994 GST TRUST,         )
C. ELDRIDGE 1994 GST TRUST,              )
P.K. SAMMONS 1994 GST TRUST, and         )
K'S MERCHANDISE MART, INC.               )      CIVIL ACTION NO.
                                         )      08-11254-DPW
          Plaintiffs.                    )
                                         )
v.                                       )
                                         )
GORDON BROTHERS GROUP, LLC,              )
WILLIAM WEINSTEIN, FRANK MORTON,         )
                                         )
          Defendants.                    )


MEMORANDUM AND ORDER
August 4, 2011

Plaintiffs, K's Merchandise Mart, Inc. ("Old K's") and its
shareholders, brought this action against Gordon Brothers Group,
LLC ("Gordon") and two of its executives, William Weinstein and
Frank Morton, (collectively, "Defendants") following the
liquidation of Old K's assets.  Plaintiffs contend Defendants
made several misrepresentations, including that they planned to
save the company from liquidation, when in fact they had no
intention to do so.  Defendants have moved for partial summary
judgment.  For the reasons stated below, I will grant Defendants'
motion.

## A.    *Old K's Structure and Challenges*

Old K's, was a Delaware-based retail business founded by the Eldridge family in the 1950's.  The company offered general merchandise products, including furniture and jewelry across the country.  David Kay Eldridge ("Kay") and his brother, Ray, were respectively the President and the Vice-President of Old K's and each held almost 50% of Old K's shares. Kay Eldridge's children, Patricia Sammons and Chris Eldridge, were also involved in the family business, as co-trustees of a trust that owned a small amount of the company's shares.

For many years, Old K's was a successful family business. Starting in 2000 however, the company began to face intense pressure from large discount retailers such as Wal-Mart and Target, or "category killer" specialty stores, such as Best Buys and Toys "R" Us.  This competition had a negative impact on the company's sales, resulting in a net loss of $1.8 million in 2004. Old K's sales did not constitute its only source of financing. The company also benefitted from a revolving loan obtained in 2001 from LaSalle Bank National Association ("LaSalle").[1]

## B.    *Reports Recommending the Liquidation of Old K's*

Due to the company's poor performance, Old K's consulted in

---

[1] As is common practice, the balance on the revolving loan fluctuated with the amount of inventory maintained by Old K's.

May 2005 with William Blair & Co. ("Blair"), an investment firm, about the prospect of selling the family business within a year. Blair stressed that the prospect of a strategic buyer was unlikely and that "liquidation was the most logical approach for the owners." Shortly thereafter, Blair introduced Old K's Chief Financial Officer, Richard Powers, and Old K's attorney, John Cobb, to Gordon. By agreement dated July 20, 2005, Old K's retained Gordon to "provide preliminary advice and consultation to [Old K's] in connection with a possible orderly liquidation of [Old K's] 'big box' format stores . . . [and] develop a plan for the disposition of all inventory in the [s]tores with reference to the optimal timing of a 'store closing' or similar themed sale." The purpose of retaining Gordon was, in Kay Eldrige's view, to obtain "different viewpoints and evaluate [Old K's] options" in the event they "decide[d] to liquidate."

At the end of August 2005, Gordon extended an offer to buy Old K's business for $25 million. Kay Eldridge refused Gordon's offer, on the assumption that the company was worth much more. Nevertheless, Old K's performance continued to decline in the months following Gordon's offer. Despite the holiday season, Old K's suffered a much higher loss in the fiscal year ending in January 2006 than in the previous year.[2] Shortly thereafter,

_____

[2] The parties disagree regarding the amount of loss Old K's sustained during the fiscal year ending in January 2006. Defendants argue the loss for this period amounted to $6.7

LaSalle sent Old K's a notice of default for violation of the financial performance covenants, reduced its line of credit by $4 million, and stopped honoring checks to Old K's vendors, thereby putting the company in a dire financial situation. Robert Barnhard of LaSalle met with representatives of Old K's in February 2006. During this meeting, Barnhard openly disagreed with the company's intention to reduce its inventory to improve profitability, and requested the production of a 13-week cash flow projection and business plan. Because Old K's was unable to comply with this request, LaSalle retained Alliance Management, Inc. ("Alliance"), a consulting firm, to evaluate Old K's performance.

Alliance issued a report on February 28, 2006. Noting that the accumulated loss had "exceeded $8 million dollars for the 3 year period," Alliance found that Old K's was "facing significant liquidity challenges that [we]re material to the continuing business operations." Alliance also noted that Old K's "business model does not appear to be feasible given the current configuration of the company and its capital structure." Following the issuance of this report, LaSalle demanded that Old K's be liquidated by the end of April 2006.

---

million. By contrast, Plaintiffs suggest that this amount did not take into account assets and revenue of over $3.5 million in diamond inventory. Regardless of which number is correct, the loss for the fiscal year ending in January 2006 was higher than the loss sustained by the company the previous year, i.e., $1.8.

In an effort to ease the pressure from LaSalle, Old K's hired a consulting firm, Buccino & Associates ("Buccino"). Like Alliance, Buccino concluded that Old K's was facing a liquidity crisis and "would be out of cash by October [2006], possibly as early as July [2006]." The role of Buccino soon shifted to assisting Old K's in preparing a plan to sell substantially all of the assets of the company. In Buccino's view, "[i]t was very quickly understood that there wasn't time or money to effect a turnaround."

LaSalle and Old K's entered into a forbearance agreement on April 5, 2006, in which Old K's admitted defaults with regard to its coverage ratio and confirmed its intention to file a voluntary bankruptcy notice on April 17, 2006. To this end, Old K's retained bankruptcy counsel, Mayer Brown, LLP, and a bankruptcy communications consultant, Sitrick & Company. In addition, Old K's sought proposals to conduct a nationwide liquidation sale from the major liquidation firms, including Gordon, Hilco, American Group, and Tiger Capital.

## C. *The Representations Made by Gordon and the Letter of Intent*

Meanwhile, Gordon remained interested in acquiring Old K's. In an email sent to several Gordon's employees on March 30, 2006, Weinstein described his strategy as follows:

> Guys, we felt like there was $20ml of equity in the deal
> 6 months ago. It did not erode that quickly. We need to
> see in our numbers how much of the real estate is company
> owned versus outside the company. We think most is in the

5

company which is good. This case could be a classic out of court deal. We guarantee the bank to shut them up. We go to a creditor rights lawyer and hire them to represent the trade in an out of court. We either propose a plan or percentage plan distribution at less than 100% and more than a bankruptcy would pay them. We pick up the 'equity' in the discount. We run through x-mas out of court.

So we had $6.0ml over the debt before any costs, losses, fees etc. Not so great. Here is the upside though. If we can cash the trade for let's say 70% (should be a no brainer in today's market) we pick up $6.0ml. If we can get to a x-mas sale with augment, I think the net is close to 100 cents on cost if not more.

In early April, Weinstein and Morton met with representatives of Old K's to discuss the prospect of guaranteeing the loan with LaSalle and acquiring the company. During this meeting, Defendants made several representations, which are at the core of the present matter. Defendants represented that, upon completion of the creditor composition, they planned to operate Old K's as a going concern at least through the Christmas selling season before making a decision on whether to continue the operations, sell or liquidate the company. They assured Old K's management that they had the expertise and experience to do so. Further, Defendants stated that Gordon would guarantee payment for future shipments from suppliers within a week, that they would consult with Old K's management prior to making any major decisions with regard to the company's operations, and that Weinstein would rent an apartment in Decatur, where Old K's headquarters were located, in an attempt to keep the company running.

6

Based on these representations, Old K's and [Gordon] entered into a letter of intent on April 5, 2006. Pursuant to this letter, [Gordon] became Old K's "exclusive agent in connection with the continued operation and/or liquidation of the Company's business operations and disposition of assets of the Company . . . all in Gordon's sole discretion (but [Gordon] will use best efforts to keep the Company's officers reasonably informed of [Gordon]'s decision-making process)." The letter also provided that "it may be necessary to restructure the Company entity in order to accomplish the foregoing as well as the economic equivalent of the [t]ransaction."

Shortly thereafter, Defendants attempted to convince LaSalle to continue financing Old K's outside of a bankruptcy proceeding, but LaSalle insisted on being paid in full. As a result, on April 12, 2006, Gordon Retails Partners, LLC advanced approximately $40 million necessary to pay LaSalle off in full and became Old K's lender. During the same time period, Defendants and Old K's attorneys prepared a draft moratorium letter to be sent to all Old K's creditors. As part of that process, Weinstein sent an email on April 28, 2006 to Old K's attorneys, copying Richard Powers, Old K's CFO, suggesting that the draft should make clear the following:

> Where it says [Gordon] desires to run this as a going concern, I would rather soften this to say that we will do so as we evaluate whether a restructuring of the company is feasible. Something like this. I do not want

to sound like we are committing to this.

Along the same lines, Weinstein again reminded Old K's attorneys and its CFO on May 1, 2006 that the draft should not overstate Gordon's intention:

> It is clearly our intention to run the company for a period of time while we determine what the right configuration/make-up of the business is. We just want to be clear that this is a broken business that we see some underlying value in. However, there are no sure things and we don't want to over promise.

## D.    *The Creation and Liquidation of New K's*

In an attempt to save the company from liquidation, Gordon and Old K's entered into a Limited Liability Company Agreement (the "LLC Agreement") on May 6, 2006. During the negotiations and conclusion of the agreement, Old K's was represented by John Cobb, its attorney, as well as by Mayer Brown. The purpose of the LLC Agreement was to create New K's Merchandise LLC ("New K's"), a Delaware company that would inherit the business operations of Old K's, including certain of its assets and liabilities. Gordon and Old K's, which held respectively 77.5% and 22.5% of New K's capital, were the signatories of the LLC Agreement and the only members of New K's. Powers, Old K's attorney, concedes that, had Old K's not entered in the LLC Agreement on May 1, the most likely outcome would have been the bankruptcy and liquidation of the company.

The LLC Agreement designated Gordon as the "sole manager" of New K's. LLC Agreement, § 3(b). In this capacity, Gordon had

the authority to "exercise all the powers and privileges granted to a limited liability company," including the right to liquidate the entity. *Id.*, § 3(a). Gordon undertook to "use its best efforts to consult with [Old K's] regarding the Managers' conduct of the affairs of the Company" and "to keep each Member fully informed of any material decisions and activities of the Manager with respect to the Company." *Id.*

In addition, the LLC Agreement provided for a "Liquidating Distribution" scheme, allowing Old K's to recover a minimum distribution of $3 million, subject to certain deductions, in the event the creditors were composed without a bankruptcy filing, or $1.5 million if New K's filed for bankruptcy despite the creditor composition. *Id.*, § 6(b)(iii). The LLC Agreement also contained an integration clause stating that agreement "embodies the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter." *Id.*, § 16(g).

Following the conclusion of the LLC Agreement, Gordon managed in July 2006 to obtain the agreement from the majority of Old K's unsecured creditors to accept 50% of the amount owed and to release Old K's shareholders from potential claims. The composition of Old K's creditors allowed the company to save millions of dollars in debt and be kept out of bankruptcy. In a

matter of weeks, Gordon deployed substantial resources to replenish the company's inventory, in an attempt to reverse the decline in sales. It also worked on improving New K's merchandising, advertising, and operations. The effectiveness of Gordon's work during that period is, however, disputed by Plaintiffs.

Although Gordon offered to guarantee the payment of New K's vendors for a certain amount of time, New K's vendors were often reluctant to deal with New K's due to the liquidity crisis faced by Old K's. Richard Powers, Old K's CFO, admitted in a letter dated July, 20 2006 that Gordon had little control over the stock because "many of our vendors were not shipping new merchandise until the [c]omposition [of creditors] was approved and implemented."[3]

At the end of August 2006, it became clear to Gordon that New K's stores were "[j]ust not doing the business," according to Weinstein. On this basis, Gordon determined that its efforts to turn around the company's business had failed and decided to liquidate New K's. Powers agreed that, should the company be liquidated, "the best time in which to accomplish that [liquidation] is the last quarter of the year in order to take

_____

[3] Plaintiffs contend that Richard Powers later testified that he did not "recall" whether any vendor refused to ship until the creditor composition was approved and implemented. Yet, during deposition, Powers admitted that the statement he had made in the letter dated July 20, 2006 was truthful.

advantage of the holiday selling season." Gordon announced on October 3, 2006 that New K's would be closing its stores at the end of the year. New K's business operations ceased in January 2007, and its wind-down proceeded after that date.

After the beginning of the liquidation, Old K's made multiple attempts to obtain financial and performance information from Gordon. In March 2008, Old K's received the sum of $1,748,217 from New K's, which represented the minimum $3 million minus certain adjustments, and Old K's was authorized to conduct an on-site inspection of documents. Because some documents appeared to be missing, Old K's requested additional information from Gordon. In May 2008, the company received two CD's of information in response to this request.

## II. STANDARD OF REVIEW

Summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Traditionally, "[a] dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011) (quoting *Rodríguez- Rivera v. Federico Trilla Reg'l Hosp.*, 532 F.3d 28, 30 (1st Cir. 2008)).

When ruling on summary judgment, a district court must view "the facts in the light most favorable to the party opposing summary judgment." *Rivera-Colón v. Mills*, 635 F.3d 9, 10 (1st Cir. 2011). "Where, as here, the nonmovants have the burden of proof on the dispositive issue, they must point to 'specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010) (quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)). A court may not rely on "conclusory allegations, improbable inferences, and unsupported speculation." *Del Toro Pacheco v. Pereira*, 633 F.3d 57, 62 (1st Cir. 2011) (quoting *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009)).

## III.  DISCUSSION[4]

_____

[4] At the outset, Defendants argue that the claims of Old K's shareholders, should be dismissed for lack of standing. I agree and note that Plaintiffs failed to address this issue in their opposition. Defendants' argument is premised on the tenet that "a corporation and its shareholders are distinct juridical persons and are treated as such in contemplation of law." *Pagan v. Calderon*, 448 F.3d 16, 28 (1st Cir. 2006). That means that "[a]ctions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock." *Id.* (quoting *In re Dein Host, Inc.*, 835 F.2d 402, 405 (1st Cir. 1987)) (alterations in original). Here, the only signatories of the LLC Agreement are Old K's and Gordon. To be sure, Old K's shareholders agreed to be bound by a Joinder Agreement; but this agreement was limited to the provisions and obligations set forth Section 13 (i.e., representations and warranties by Old K's) and Section 14 (i.e., indemnification by Old K's shareholders in favor of Gordon) of the LLC Agreement.

Plaintiffs filed a three-count complaint on July 22, 2008, alleging that Defendants made several false misrepresentations designed to induce them to form New K's and transfer Old K's assets (Count I), that they failed to provide an accounting of the financial condition and operations of New K's (Count II), and more generally, that they breached several provisions of the LLC Agreement (Count III).  Following a lengthy discovery process, Defendants moved for partial summary judgment on the claims for (A) fraudulent inducement and (B) breach of contract, as it pertains to the implied covenant of good faith and fair dealing. Defendants also allege that (C) Plaintiffs' damages theory based on "benefit of the bargain" is too speculative to warrant recovery.

## A.    *Fraudulent Inducement*[5]

---

It does not confer any rights to Old K's shareholders under the LLC Agreement.  Accordingly, I conclude that Old K's is the only party with standing in the present matter and that the claims brought by Old K's shareholders in their own name should be dismissed for lack of standing.

[5] As the parties agree, Illinois law governs the fraudulent inducement claim.  "Where there is at least a reasonable relation between the dispute and the forum whose law has been selected by the parties, we will forego an independent analysis of the choice-of-law issue and apply the state substantive law selected by the parties." *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 127 n.5 (1st Cir. 2006) (quoting *Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 496 n.2 (1st Cir. 2005)) (internal quotation marks omitted).  A "reasonable relation" exists between the present dispute and Illinois law given that Plaintiffs are located in Illinois and the alleged misrepresentations occurred in that state.

In Count I, Plaintiffs contend that Defendants made several misrepresentations in an attempt fraudulently to induce Old K's to enter into the LLC Agreement.

In order to state a claim for fraudulent inducement under Illinois law, a plaintiff must demonstrate that the representation is "(1) one of material fact; (2) made for the purpose of inducing the other party to act; (3) known to be false by the maker, or not actually believed by him on reasonable grounds to be true, but reasonably believed to be true by the other party; and (4) was relied upon by the other party to his detriment." *Jordan v. Knafel*, 880 N.E.2d 1061, 1069 (Ill. App. Ct. 2007). Defendants argue that the fraudulent inducement claim fails as a matter of law on the ground that (1) the alleged statements do not constitute actionable misrepresentations,(2) they are barred by the integration clause contained in the LLC Agreement, and (3) Plaintiffs waived any fraudulent inducement claim when they accepted payment of the liquidating distribution, instead of challenging Gordon's decision to liquidate New K's in a timely fashion.

### 1. Actionable Misrepresentations

Defendants' first defense against the fraudulent inducement claim is that the alleged misrepresentations offer nothing more than predictions of future conduct, puffery, or statements of opinion, and are therefore non actionable. The alleged

misrepresentations concern either (a) specific statements of intent concerning future conduct, or (b) expertise asserted by Defendants during the course of the negotiations preceding the conclusion of the LLC Agreement.  These two types of misrepresentations will be discussed separately.

a.   *Statements of Future Intent*

The core of the fraudulent inducement claim rests on several statements reflecting Defendants' alleged intention to perform future conduct.  Specifically, Plaintiffs contend that Defendants made the following representations:

i.   Gordon planned, upon completion of the creditor composition, to operate New K's as a going concern at least through the Christmas 2006 selling season before making a decision on whether to continue operations, sell or liquidate;[6]

ii.  Gordon would guarantee future shipments from suppliers within a week of the conclusion of the LLC Agreement; and

iii. Gordon would consult with New K's Management on any important decisions.

These representations[7] were false, according to Plaintiffs,

_____

[6] In their opposition, Plaintiffs contend that Gordon misrepresented that they would "turn around [Old] K's and save it from liquidation."  By contrast, Plaintiffs had claimed both in the complaint and their statement of material facts that the representation was instead to operate the company "as a going concern at least through the Christmas 2006 selling."  I will deem these two themes to be interchangeable for purposes of this Memorandum and Order.

[7] In addition to the statements identified in the text, Plaintiffs alleged initially that Defendants misrepresented that Weinstein would rent an apartment in Decatur.  Although

because Defendants never "intended to do anything other than to liquidate New K's."

Plaintiffs' reliance on misrepresentations of intention to perform future conduct, also known as "promissory fraud," is disfavored in Illinois because it "is easy to allege but difficult to prove or disprove." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (applying Illinois law). It follows that "[a] statement of future intention cannot generally be the basis of a claim of fraud because alleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct." *Bradley Real Estate Trust v. Dolan Assocs. Ltd.*, 640 N.E.2d 9, 12-13 (Ill. App. Ct. 1994). But this rule admits of an exception where the false promise or representation of future conduct is "part of a scheme to defraud." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 722-23 (7th Cir. 2011) (quoting *Ass'n Benefit Servs., Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007)) (applying Illinois law); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989) (holding that

---

Defendants addressed this statement in their memorandum, Plaintiffs failed to do so in their opposition. By contrast, Plaintiffs claim for the first time in their opposition that Defendants falsely misrepresented that Gordon "would only make money by running New K's as opposed to liquidating it." They fail, however, to adduce any evidence showing that such a representation was ever made. For these reasons, both statements will be disregarded for purposes of this Memorandum and Order.

promises may be actionable where "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud.") (internal citation omitted)).

The scheme exception applies when "a party makes a promise of performance, not intending to keep the promise of performance but intending another party to rely on it, and where the other party relies on it to his detriment." *Concord Indus., Inc. v. Harvel Indus. Corp.*, 462 N.E.2d 1252, 1255 (Ill. App. Ct. 1984); *see also Price v. Highland Cmty. Bank,* 722 F. Supp. 424, 460 (N.D. Ill. 1989) ("if the intention behind the intentionally false promise is to induce the promisee to act for the promisor's benefit, the promise is actionable"). Plaintiffs fail to meet the requisites for this exception.

i.  *Gordon's Plan to Operate Old K's as a Going Concern*

The first alleged promise - the plan to operate New K's as a going concern through the Christmas selling season - does not suggest that Defendants engaged in a fraudulent scheme.

For one thing, Plaintiffs cannot show that Defendants did not intend, at the time the statement was made, to do as they said they would. Plaintiffs' reliance on spreadsheet documents created prior to the LCC Agreement showing a liquidation phase starting in November 2006 is unpersuasive. Contrary to Plaintiffs' contention, these documents do not demonstrate that Gordon's intention was to commence liquidation at that time;

instead, they merely suggest that Gordon made financial

*projections* to consider beginning the liquidation of New K's

assets in November 2006.[8]  Further, these projections are

consistent with Gordon's role to act as the company's agent in

connection with the continued operation and/or liquidation of its

assets.

Equally unpersuasive is Plaintiffs' reliance on a series of

emails between Gordon's employees, most of which date *after* the

conclusion of the LLC Agreement.  Only two of these emails were

sent *before* the conclusion of the LLC Agreement and neither one

demonstrates that Defendants did not have the intention to run

the company as claimed.[9]

For another thing, even assuming *arguendo* that the evidence

cited above creates a genuine issue of material fact regarding

misrepresentation concerning the potential for continuing as an

---

[8] Plaintiffs places great weight on the fact that, Morton recognized during deposition, that Gordon did not create any financial analysis premised on the idea of Old K's turnaround. But as Morton explained, though Gordon approached Old K's as a liquidation strategy, they "always kept open the options for other things to happen," while making clear that "it was highly likely that this was a liquidation."

[9] Weinstein stated in the first email dated March 30, 2006 that his plan was to acquire Old K's and run it "through x-mas out of court."  The second email sent by Morton on April 21, 2006 suggests the possibility of conducting "2 or 3 store wide events during the next 6 months without taking the juice out of the liquidation."  This email corroborates Gordon's intention to run the company for at least the next 6 months, i.e., until November 2006.  The potential that liquidation was likely at the end of this period was, however, a prospect Plaintiffs could not ignore because it was plainly under consideration.

ongoing firm, Plaintiffs cannot show that one could have relied reasonably on the alleged promise. At the time of the conclusion of the LLC Agreement, Plaintiffs could not ignore that Old K's was in a dire financial situation and that its liquidation was a likely prospect. No less than five consulting or investment firms – Blair, Alliance, Buccino, LaSalle, and XRoads – had recommended the liquidation of Old K's assets at that time. For instance, Buccino stated that "[i]t was very quickly understood that there wasn't time or money to effect a turnaround." Given the circumstances, Plaintiffs cannot reasonably allege that Gordon made a reliable commitment to operate Old K's during that time period. Rather, as Richard Powers admitted, their commitment was limited to making a "genuine effort" to continue to operate the company. The parties' letter of intent, which empowered Gordon to act as the company's exclusive agent in connection with not only Old K's continued operations, but also with the liquidation of its assets, corroborates this view. More importantly, Weinstein made clear to Old K's in April 2006 – prior to the conclusion of the LLC Agreement – that while Gordon desired to run the company "as a going concern," they would do so as they "evaluate whether a restructuring of the company is feasible." The reason was that Gordon did not "want to sound like [it was] committing to this." Along the same lines, Weinstein reaffirmed to Old K's on May 1, 2006 – also prior to the conclusion of the LLC Agreement – his "intention to run the

company for a period of time while we determine what the right configuration/make-up of the business is." In making this reaffirmation, his stated objective was to make "clear that this is a broken business that we see some underlying value in," but that "there are no sure things and we don't want to over promise." Thus, Old K's could not ignore the prospect of a liquidation prior to the end of 2006.[10]

The alleged promise pertaining to Gordon's plan to operate New K's as a going concern fails for another reason. Whether a company, especially a financially-distressed company, can be saved from liquidation is rarely reliably ascertainable. For this reason, "[t]he general rule in Illinois is that any statements regarding future events, circumstances, profitability, and financial success cannot be a basis for a fraud claim." *Bixby's Food Sys. v. McKay*, 193 F. Supp. 2d 1053, 1065 (N.D. Ill. 2002); *Niemoth v. Kohls*, 524 N.E.2d 1085, 1094 (Ill. App. Ct. 1988) ("although representations as to the past income of a business are actionable, representations as to the future income are not."); *Ziskin v. Thrall Car Mfg. Co.*, 435 N.E.2d 1227, 1231 (Ill. App. Ct. 1982) (categorizing a representation of future

---

[10] To the extent Plaintiffs contend that Defendants should have waited until the end of the December 2006 to liquidate, the theory is undermined by the recognition expressed by Richard Powers, Old K's CFO, that, should the company be liquidated, "the best time in which to accomplish that [liquidation] is the last quarter of the year in order to take advantage of the holiday selling season."

profitability "as an opinion of future occurrence, which without more, is not actionable"). Several courts applying Illinois law have recognized that representations concerning the financial health of a company constitute generally inactionable statements of opinion. *See Fogel v. Gordon & Glickson, P.C.*, 393 F.3d 727, 730 (7th Cir. 2004) ("the firm's representation to [plaintiff] concerning the future value of the PC's remaining assets was a prediction, rather than a promise on which a reasonable person could rely."); *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1299 (7th Cir. 1993) ("the statement was only an opinion that the partnership, not yet in existence, would produce a profit, and was not a representation of a pre-existent or present fact."); *Hengel, Inc. v. Hot 'N Now, Inc.*, 825 F. Supp. 1311, 1321 (N.D. Ill. 1993) (rejecting "plaintiff's assertion that the projected financial statements can support a claim for fraud.").

*ii. Gordon's Promise to Guarantee Future Shipments*

As to the second alleged promise – to guarantee future shipments – the record falls short of establishing a scheme to defraud. Again, Plaintiffs cannot demonstrate that Defendants did not have the intention to do as they said at the time the statement was made. As Gordon explained, even though it offered to guarantee the payment of New K's vendors during a certain amount of time, New K's vendors were often reluctant to deal with the company due to the liquidity crisis faced by Old K's.

Plaintiffs contend that, instead, the delay was caused by Gordon's failure to provide financial information and by its refusal to guarantee vendors beyond September 2006. This statement is decisively contradicted by Richard Powers, Old K's CFO, who admitted in July 2006 that Gordon had little control over the stock because "many of our vendors were not shipping new merchandise until the [c]omposition [of creditors] was approved and implemented." No actionable misrepresentation was made in this connection.

### iii. Lack of Consultation

A similar analysis applies to the third alleged promise to consult with Old K's management prior to making any important decisions regarding the company's operations. Again, it appears from the record that Defendants did not consult with Old K's management to the extent Plaintiffs perhaps wished to be consulted, but that alone is not sufficient to make out a claim for promissory fraud, since there is no proof that Defendants made the alleged promise never intending to keep it. Morever, Plaintiffs do not establish how more consultation would have lead to a different result. As Alliance reported in February 2006, Old K's "business model does not appear to be feasible given the current configuration of the company and its capital structure."

In short, I conclude that the record does not support an inference that Defendants engaged in a scheme to defraud.

Plaintiffs have done nothing more than to adduce evidence that Defendants eventually did not act as they said they would. *See Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009) (rejecting fraud claim "when the evidence of intent to defraud consists of nothing more than unfulfilled promises and allegations made in hindsight.") (quoting *Caremark Rx*, 493 F.3d at 853). This is not enough to support a claim for fraudulent inducement. *See Omnicare,* 629 F.3d at 723 (rejecting fraud claim on the ground that plaintiff "has not put forth sufficient evidence to prove that [defendants] were engaged in a scheme to defraud it."). As Judge Posner has observed, "a promissory fraud is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Desnick v. Am. Broadcasting Co., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1985) (applying Illinois law). Plaintiffs did not meet this standard.

>     b.  *Gordon's Expertise to Operate Old K's*

Plaintiffs contend that Defendants falsely represented that Gordon possessed the experience and expertise to turn the business around, to make it profitable, and to save it from bankruptcy. Defendants respond that these statements constitute puffing.

Commercial puffery refers to "meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 204 (Ill. App. Ct. 2008) (citation omitted). For this reason, general representations concerning one's expertise or experience constitute ordinarily no more than statements of opinion. *See*, *e.g.*, *Meyer*, 10 F.3d at 1299 (considering bank's statements that the partnership would be managed by "competent general partners" to be no more than opinion); *High Road Holdings, LLC v. Ritchie Bros. Auctioneers, Inc.*, No. 07-4590, 2008 WL 450470, at *7 (N.D. Ill. Feb. 15, 2008) (applying Illinois law) ("to the extent that [plaintiff's] claim focuses on [defendant]'s website's claims of expertise, they rely on puffery that is not actionable as fraud."); *Nanlawala v. Jack Carl Assocs., Inc.*, 669 F. Supp. 204, 207 (N.D. Ill. 1987) (holding statements that defendant futures trader had "expertise" was merely "puffing"). The rationale is that a business "might have been expected to put its best good forward at a sales meeting." *Baeco Plastics, Inc. v. Inacomp Fin. Servs., Inc.*, No. 92-0798, 1993 WL 410066, *12 (N.D. Ill. Oct. 13, 1993).

To overcome a "puffery defense," Plaintiffs might undertake to show that Defendants represented that Gordon had experience in a field, where they knew it had none. That is not what

Plaintiffs have alleged.  They never argued that Gordon had not run several companies in the past or that they did not have the expertise necessary to run New K's.  Instead, they claim that *all* the individuals at Gordon who worked on New K's "had *primarily* liquidation experience."  To support their claim, Plaintiffs rely on the depositions of five employees and independent consultants who worked on New K's.  The mere fact that these five individuals admitted that their recent experience at Gordon focused on liquidation does not mean that they, or more generally, the company did not have sufficient experience to turn around New K's.  Importantly, Joseph McLeish, one of the consultants cited by Plaintiffs, testified to nearly 20 years of experience in operating jewelry and catalog showroom prior to joining Gordon.  In any event, Plaintiffs fail to show how expertise to liquidate or turn around a company differ.  As McLeish stated, there is not necessarily a difference between these two concepts in the sense that "if you're going to do a liquidation, obviously it's not going to be successful, if you can't turn around that consumer trend, if you can't get customers in the door."  Plaintiffs have failed to show that the alleged representations pertaining to Gordon's experience were more than puffery.

    *c.   Conclusion*

    Having found that the alleged misrepresentations are not actionable statements of fact, I conclude that summary judgment

as to Count I is appropriate.  Nevertheless for purposes of
completeness of this Memorandum and Order, I will address the
remaining arguments advanced by Defendants regarding the impact
of the integration clause of the LLC Agreement, as well as the
effect of the waiver.

    2.  <u>Integration Clause</u>

Defendants' second defense to the fraudulent inducement
claim is that the existence of an integration clause in the LLC
Agreement weighs toward finding that reliance on any unwritten
pre-contractual promises could not have been reasonable.  I
disagree in part.

Unlike a non-reliance provision, "an integration clause will
not preclude a plaintiff from relying upon extrinsic evidence in
order to establish a cause of action for fraud." *W.W. Vincent
and Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 968 (Ill.
App. Ct. 2004).  The reason behind this rule is as follows:

> [F]raud is a tort, and the parol evidence rule is not a
> doctrine of tort law and so an integration clause does
> not bar a claim of fraud based on statements not
> contained in the contract. Doctrine aside, all an
> integration clause does is limit the evidence available
> to the parties should a dispute arise over the meaning of
> the contract. It has nothing to do with whether the
> contract was induced by fraud.

*Id.* (quoting *Vigortone AG Prod., Inc. v. PM AG Prod., Inc*., 316
F.3d 641, 644 (7th Cir. 2002)) (alteration in original).

Defendants rely on *Barille v. Sears Roebuck*, for the
proposition that an unambiguous integration clause may preclude a

fraud claim based on pre-contractual misrepresentations. 682
N.E.2d 118, 123 (Ill. App. Ct. 1997). But the same Illinois
appellate court has more recently rejected *Barille*'s approach, on
the ground that "the presence of an integration clause in the
agreement does not bar the plaintiffs' actions for fraud." *First
Colony Life*, 814 N.E.2d at 968; *Salkeld v. V.R. Bus. Brokers*, 548
N.E.2d 1151, 1157 (Ill. 1989) (noting that parol evidence rule
shall "not be permitted to be used for the accomplishment of
fraud") (internal citation omitted). Yet, this approach applies
only to misrepresentations that do not fall within "the meaning
of the contract." *First Colony Life*, 814 N.E.2d at 968. This is
the case for those pertaining to Gordon's expertise, which I have
found to constitute mere puffery. *See* Section III.A.1.b. *supra*.
The same is not true, however, of the misrepresentations
pertaining to Gordon's authority to conduct New K's operations.
On this point, the LLC Agreement is clear in the sense that it
grants Gordon the sole authority to conduct New K's business
activities or to liquidate its assets. LLC Agreement, § 3(a) & §
3(b). Similarly, the LLC Agreement states that Gordon "shall use
its best efforts to consult with [Old] K's" regarding the conduct
of the company. *Id.*, § 3(a).

Accordingly, I conclude that any representations regarding
Gordon's authority to conduct New K's activities or its duty to
consult with Old K's management are barred by the integration

clause contained in the LLC Agreement.  By contrast, I do not find the integration clause would bar statements of competence to performing which I have, however, found as alleged otherwise non-actionable puffery.

3.  Waiver

Defendants' last argument on summary judgment is that Plaintiffs waived their fraudulent inducement claim by accepting payment of the liquidating distribution, instead of challenging Gordon's decision to liquidate New K's in a timely fashion.  I find this argument unconvincing.

Nearly fifty years ago, the Illinois Supreme Court held that:

> A person who has been misled by fraud or misrepresentation is required, as soon as he learns the truth, to disaffirm or abandon the transaction with all reasonable diligence, so as to afford both parties an opportunity to be restored to their original position. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit or relief from the misrepresentations.

*Eisenberg v. Goldstein*, 195 N.E.2d 184, 186-87 (Ill. 1963). "Specifically, waiver will apply if a party, after discovering the alleged fraud and with full knowledge of its materials aspects, engages in conduct which is inconsistent with an intention to sue." *Kaiser v. Olson*, 435 N.E.2d 113, 118 (Ill. App. Ct. 1981).  The rationale is that "[o]ne is not permitted to

lie back and speculate as to whether avoidance or affirmance of a contract will ultimately prove more profitable." *Id.*

That said, "[a]n additional and essential element [of the waiver] is that the injured party intend to affirm the contract *and* intend to abandon his right to recover damages for the loss resulting from the fraud." *Lee v. Heights Bank*, 446 N.E.2d 248, 254 (Ill. App. Ct. 1983). "If the intention to waive is implied from conduct, the conduct should speak the intention clearly." *Havoco of Am., Inc. v. Hilco, Inc.*, 799 F.2d. 349, 354 (7th Cir. 1986) (citation omitted) (applying Illinois law). Generally, "[t]he question of intent is one of fact for the jury to decide." *Lee*, 446 N.E.2d at 254.

There is a dispute of material fact as to whether Plaintiffs intended to waive their right to sue for the alleged fraud. To be sure, one could argue that Plaintiffs were aware of the alleged fraud long before they decided to sue. As of October 2006, when the liquidation was announced, Plaintiffs could not reasonably ignore that Gordon failed to consult with Old K's management as expected or to guarantee the vendors in due course. Nor could they ignore that Gordon did not wait until the end of 2006 to make a decision to liquidate. Still, Plaintiffs did not stay "idle" following the commencement of the liquidation. They began searching for a legal counsel in a timely fashion. After the lawyers were retained, they sent successive letters to Gordon

seeking financial and performance information starting in 2007 through March 2008, when the payment of the distribution liquidation was paid. That same month, they were allowed to conduct an onsite inspection of documents and found out that some of them were missing. It was only in May 2008 that Defendants produced certain documents, which Plaintiffs now claim demonstrate Gordon's pre-existing plan to liquidate New K's. The present matter was filed promptly thereafter in July 2008.

Accordingly, I conclude that "[w]hile the principle of waiver may apply, whether it does apply is a question of fact that is not appropriately a subject for summary judgment here." *Stamatakis Indus., Inc. v. King*, 520 N.E.2d 770, 774 (Ill. App. Ct. 1987); *Lee*, 446 N.E.2d at 254 (same).

## B. *Breach of Implied Covenant of Good Faith and Fair Dealing*[11]

Plaintiffs contend that Gordon breached the contractual covenant of good faith and fair dealing implied in the LLC Agreement.

---

[11] The alleged breach of the implied covenant of good faith and fair dealing is a contract-based claim governed by Delaware law. The LLC Agreement provides that "[t]his Agreement and the rights and obligation of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware." LLC Agreement, § 16(c). Massachusetts, "absent any contravening public policy, honors choice-of-law provisions in contracts." *Hartford Fire Ins. Co. v. CNA Ins. Co. (Europe) Ltd.*, 633 F.3d 50, 54 n.7 (1st Cir. 2011). I see no reason to reject the parties' choice of Delaware law.

Under Delaware law, every contract contains an implied covenant of good faith and fair dealing that "requires 'a party in a contractual relationship to restrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap v. State Farm Fire and Cas. Co.*, 878 F.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985)). When evaluating the merits of a covenant claim, a court "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (en banc). "Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 F.2d 442 (citation omitted). Nevertheless, "courts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication." *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, No. 13911, 1995 WL 662685, at *8 (Del. Ch. Nov. 2, 1995)) (internal quotation marks and citation omitted).

Defendants' first contention – that the complaint fails to plead an implied covenant claim as a matter of law – is easily disposed of. It is well-established that a breach of an implied covenant of good faith and fair dealing requires allegations of "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *S. Track & Pump, Inc. v. Terex Corp.*, 623 F. Supp. 2d 558, 562 (D. Del. 2009) (applying Delaware law). The complaint does just that. It states that Gordon "breached the contractual covenant of good faith and fair dealing implied [in] the LLC Agreement when it engaged in the [alleged] fraud and mismanagement." (Compl. ¶ 76.) Plaintiffs later filed a supplemental letter from their expert, James K. Steward, on September 15, 2010, explaining that Gordon had "breached the covenant of good faith and fair dealing by not undertaking an operational turnaround of [New] K's." As to damages, the complaint requests "an accounting, and award [of] compensatory damages, exemplary damages, and attorney's fees and for such other relied as this Court deems just and proper." The allegations contained in the complaint are sufficient to raise the claim.

Nevertheless, the implied covenant claim fails as a matter of law. Plaintiffs confuses breach of contract and breach of implied covenant, which is "a limited and extraordinary legal

remedy" that addresses only events that could not reasonably have been anticipated at the time the parties contracted. *Nemec*, 991 A.2d at 1128. The implied covenant has no application here not only because Plaintiffs cannot show that the liquidation of the company could not be anticipated, but also because express provisions of the LLC Agreement address the conduct of the alleged wrong. The agreement uses unambiguous language granting Gordon – as the "sole manager" of New K's – the authority "to exercise all the powers and privileges granted to a limited liability company." LLC Agreement § 3(a). The agreement also provides that Gordon has the unilateral right to liquidate New K's assets. *See id.* § 11(b) ("Events of Dissolution or Liquidation. The LLC shall be dissolved upon . . . the consent of the Manager"). Because the express terms govern, that "leave[s] no interstitial space in which the doctrine of the implied covenant might operate." *ASQR India Private, Ltd. v. Bureau Veritas Holding, Inc.*, No. 4021, 2009 WL 1707910, at *12 (Del. Ch. June 16, 2009). Moreover, Plaintiffs cannot find refuge by alleging that their expectation at the time of the LLC Agreement was that Defendants would necessarily save the company from liquidation. As discussed in great length in Section III.A.1.a.i. *supra*, Plaintiffs could not ignore that liquidation was one of the possible outcomes of the conclusion of the LLC Agreement. The parties' expectation is also reflected in the

letter of intent, which granted Gordon the authority to "act as the Company's exclusive agent in connection with the continued operation and/or liquidation of the company's business operations . . . all in [Gordon]'s sole discretion."

Accordingly, I will grant summary judgment in favor of Defendants as to Count II.

## C.  *Benefit of the Bargain Damages*

Assuming *arguendo* that the claims for fraudulent inducement or breach of implied covenant were to survive summary judgment, Defendants contend that Plaintiffs' request for benefit of the bargain damages i.e., expectation damages, is too speculative to warrant recovery.

For claims of fraudulent inducement, a plaintiff may request benefit of the bargain damages. *Kleinwort Benson N. Am., Inc. v. Quantum Fin. Servs., Inc.*, 673 N.E.2d 369, 377 (Ill. App. Ct. 1996).  The rationale is "that a defrauded party is entitled to the benefit of his bargain in a transaction and should be placed in the same position that he would have occupied had the false representations on which he acted been true."  *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1196-97 (Ill. App. Ct. 2008).  The plaintiff has the burden of establishing "a reasonable basis for computing those damages" because "[a] court may not award damages based on speculation or conjecture."  *Maloney v. Pihera*, 573 N.E.2d 1379, 1391 (Ill. App. Ct. 1991).  By parity of reasoning,

the standard measure for damages recoverable for breach of contract in Delaware is the "expectation interest" of the non-breaching party. *E.I. Dupont de Nemours and Co. v. Pressman*, 679 A.2d 436, 445 (Del. 1996). To be entitled to benefit of the bargain damages, the plaintiffs must show "a reasonable basis for the [fact finder] to estimate with a fair degree of certainty his probable loss." *Moody v. Nationwide Mut. Ins. Co.*, 549 A.2d 291, 293 (Del. 1988).

The theory advanced by Plaintiffs to justify the allocation of benefit of the bargain damages is contained in a June 15, 2010 report drafted by James K. Steward, their expert. In that report, Steward concludes that there was "a viable turnaround strategy that would have produced a higher return and recovery value for the stakeholders of [New K's] than liquidation." This conclusion is based on the assumption that two areas of operations and strategy at New K's - i.e., the excess in Selling, General & Administration Expenses (SG&A) and the inventory turnover - poorly compared with that of comparable businesses listed in the 2005 Almanac of Business and Industrial Financial Ratios and therefore could be the subject of a turnaround. Steward submitted a two-page supplemental letter on September 15, 2010, declaring that "[h]ad Gordon Brothers implemented the operational changes to lower SG&A expenses and increase inventory management, . . . , the value of the new entity would have

increased to a conservative range between $171,565,000.00 and $263,398,000.00." In his view, "[t]his range represents the value lost under the benefit of the bargain rule for fraud [and breach of implied covenant] damages," recognizing that Plaintiffs would only be entitled to 22.5% of such damages.

The expert report submitted by Plaintiffs fails to provide a reasonable basis for computing the benefit of the bargain damages. The damages are based on mere speculation that some unidentified turnaround firm would have been able to reduce the SG&A amount of New K's and accelerate its inventory turnover. The report does not provide any time frame for achieving these results, nor does it provide an assessment of the costs involved. It does not take into consideration New K's dire financial situation at the time of the liquidation either. Critically, several firms had recommended the liquidation of Old K's assets before the conclusion of the LLC Agreement. Even Powers agreed that, had Old K's not entered in the LLC Agreement on May 1, the most likely outcome would have been the bankruptcy and liquidation of the company. The report demonstrates that were this case to go to trial, jurors would be left to their own devices to determine the appropriate amount of expectation damages. For this reason, I conclude that Plaintiffs would not be entitled to recover benefit of the bargain damages, even assuming that the claims for fraudulent inducement and breach of

implied covenant survived summary judgment, which, of course, I have concluded they do not.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT Defendants' motion for partial summary judgment as Counts I and II. (Dkt. No. 43.) The parties shall submit a joint status report on or before September 9, 2011 addressing what further action is necessary to bring this case to final judgment.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE