UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID KAY ELDRIDGE, RAY ELDRIDGE, JR.,D. CHRIS ELDRIGE, as trustee, not individually, of the C. ELDRIDGE 1994 GST TRUST, PATRICIA K. SAMMONS, as trustee, not individually, of the P.K. SAMMONS 1994 GST TRUST, C. ELDRIDGE 1994 GST TRUST, P.K. SAMMONS 1994 GST TRUST, and K'S MERCHANDISE MART, INC. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>08-11254-DPW |
| Plaintiffs. | ) | |
| v. | )<br>) | |
| GORDON BROTHERS GROUP, LLC, WILLIAM WEINSTEIN, FRANK MORTON, | )<br>)<br>) | |
| Defendants. | )<br>) | |

MEMORANDUM AND ORDER
March 18, 2016

Plaintiffs, K's Merchandise Mart, Inc., ("Old K's") and its shareholders, brought this action against Gordon Brothers Group, LLC, ("GBG") and two of its executives, William Weinstein and Frank Morton, alleging fraud, breach of the implied covenant of good faith and fair dealing, and breach of contract. The lawsuit arises from the formation of New K's Merchandise, LLC ("New K's" or "the LLC") by the parties and the subsequent liquidation of the LLC by GBG. On August 4, 2011, I granted Defendants partial summary judgment. The parties thereafter filed cross-motions for summary judgment regarding the remaining

1

claims.  Additionally, Defendants filed a motion for sanctions against Old K's counsel pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927 based on Old K's filing of its motion for summary judgment.

## I.  BACKGROUND

### A.  *Factual Background*

On May 1, 2006, Old K's and GBG entered into the New K's Merchandise LLC Limited Liability Company Agreement ("the LLC Agreement") forming New K's as a Delaware LLC.  Old K's was a retail business incorporated in Illinois, while GBG was a Delaware LLC with its principal place of business in Massachusetts.  The only members of the LLC are Old K's and GBG.  Under the agreement, they respectively owned 22.5% and 77.5% interests in the business.

The LLC Agreement designates GBG as "the sole manager" of the LLC.  LLC Agreement § 3(b).  As the manager, GBG is given the authority to "exercise all the powers and privileges granted to a limited liability company by the Act or any other law or this Agreement."  LLC Agreement § 3(a).  The LLC Agreement states that "[t]he Manager shall use its best efforts to consult with K's Merchandise regarding the Manager's conduct of the affairs of the Company and will also use its best efforts to keep each

Member fully informed of any material decisions and activities of the Manager with respect to the Company." *Id.*

### 1.   Management of the Furniture Department

New K's, like Old K's before it, included a furniture department.  Gordon Brothers had limited experience running furniture departments, although GBG employee Joseph McLeish had some experience with ready-to-assemble furniture departments, and GBG had run a few store closing sales for furniture businesses.  However, GBG did not rely on its internal expertise; it hired High Point Group ("HPG") to run New K's furniture department.

Edward Borowsky, the head of HPG and New K's furniture department, stated at his deposition that when HPG took over, it looked into furniture sales; looked at the inventory; determined what pieces were mismatched, damaged, or disorganized; compared inventory levels to sales levels; and discussed the inventory with the New K's buying department.  He stated that HPG brought in independent contractors who were engaged in the field and gave feedback regarding personnel, attempting to change the attitudes of a demoralized staff.  He stated that HPG restructured New K's warehousing distribution, establishing satellite warehouses instead of relying on the central warehouses previously used.  He further stated that HPG did not

do market surveys or statistical analysis of the furniture department.

Kay Eldridge, a shareholder of Old K's; Richard Powers, Chief Financial Officer of both Old K's and New K's; and Geoff Clouser, Senior Vice-President in charge of the furniture department, all opined that the furniture department was mismanaged.  Mr. Clouser stated that it was his opinion that the changes made to the furniture department, including changes in inventory, purchasing furniture for liquidation retailers, and establishing satellite warehouses, were unreasonable given the paucity of analysis conducted beforehand. Kay Eldridge stated that the merchandise purchased was scratched and damaged, which was "a terrible thing."  Richard Powers stated that the merchandise that was brought in was overpriced.

Michael Pakter submitted an expert report on behalf of Old K's quantifying the lost profits resulting from the alleged mismanagement.  He calculated that if the gross margin of profits were at the level attained in the period of May 1, 2006, through October 4, 2006, but the sales had remained at the levels achieved during the period of May 1, 2005, through September 30, 2005, then the furniture department would have earned an additional $579,210 in profits.  He also calculated that the cost of maintaining the new satellite warehouses was

4

$558,579. Relying on Geoff Clouser's affidavit, Mr. Pakter stated that it was his understanding that the establishment of satellite warehouses increased expenses without adding to revenues. He concluded that the total lost profits for New K's furniture department was the sum of the lost profits on sales and the satellite warehouse costs, or $1,137.789.

Peter N. Schaeffer submitted an expert report on behalf of Defendants that evaluated Mr. Pakter's analysis of the furniture department. Schaeffer stated that it was his opinion that Mr. Pakter's conclusions were flawed. He stated that the assumption that the sales would have remained at 2005 levels was unwarranted because "sales for the Company were falling and as word of the Company's troubles became public, large price purchases such as furniture would be jeopardized." He further questioned why Mr. Pakter used the 2005 sales as his revenue base but retained the 2006 gross margin, which was significantly higher. Finally, he stated that Mr. Pakter did not support his claim that the satellite warehouse program was unnecessary and that the money spent on it was wasted.

### 2. Financial Record Keeping

The LLC Agreement obligates GBG, as the manager, to "keep or cause to be kept complete and accurate books and records of the LLC, using the same methods of accounting that are used in

5

preparing the federal income tax returns of the LLC to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied."  LLC Agreement § 12(a).  GBG is also required to "provide such information respecting the financial condition and operations of the LLC as either Member may from time to time reasonably request."  *Id.*

Old K's alleges that Defendants did not consult with it or keep it informed during the operation or liquidation of the business.  Old K's further alleges that its shareholders requested accounting and financial information regarding New K's from GBG numerous times from April 2007 through the discovery period for this case, and that they were rebuffed or provided with insufficient information.  Defendants dispute that any information was delayed or withheld.

### 3.   Liquidating Distributions

The LLC Agreement addresses distributions on the occasion of a liquidation of the LLC.  It states that "a distribution made upon a liquidation or winding up of the LLC (the "Liquidating Distribution") shall be made to the members, from all cash or property available for distribution."  LLC Agreement § 6(b).  Under the LLC Agreement, the Members receive liquidating distributions "on a pro rata based on their respective

Percentage Interests," with a minimum distribution to Old K's of three million dollars.[1] *Id.* The LLC Agreement further specifies that "[e]xcept as the Manager may otherwise determine, all distributions to Members shall be made in cash.  If any assets of the LLC are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Manager."  LLC Agreement § 6(d).

In March, 2008, New K's made a payment to Old K's in the amount of $1,748,217, which represents the minimum three million dollar distribution less certain adjustments for monies owed by Old K's to New K's or to GBG or withheld as a reserve for future expenses expected to be paid on Old K's behalf.  On May 18, 2009, GBG sent Old K's a document entitled "Balance Sheet for Reconciliation" ("Reconciliation") which provided balance sheets and explained the distribution amount.

    a.   *The Reconciliation*

The Reconciliation includes a calculation of New K's Expected Revenue as follows:

| Data From | **Assets** | **Amounts** | **Totals** |
|---|---|---|---|
| Balance Sheet C144 | Bank of America Cash | 6,817,471.77 | |

---

[1] A different minimum would have applied had New K's filed for bankruptcy.  Neither party asserts that the alternative minimum applies in this case.

| Balance Sheet C152 | Distribution to Old K's | 3,000,000 | |
| Balance Sheet C153 | Distribution to GB | 3,000,000 | |
| | Davenport Real Estate Not Sold | 0.00 | |
| | Decatur Land Not Sold | 0.00 | |
| Balance Sheet C22 | Bank of America and CIB Cash Account | 210,204.19 | |
| | Subtotal Assets | | 13,027,675.96 |
| | **Liabilities** | | |
| Balance Sheet C147-145 | Liabilities from Balance Sheet | 1,059,400.75 | |
| Balance Sheet C55 | Old K's Deduction Expense (800k, 175l, 100k) | 1,075,645.47 | |
| Estimated Accruals E1 | Estimated Accruals for additional 12 months | 753,760.00 | |
| | Subtotal Liabilities | | 2,888,806.22 |
| **Current Expected Revenue** | | | **10,138,869.74** |

The Reconciliation provides a "Calculation of Payout Due"

as follows:

| Total Expected Revenue | | 10,138,869.74 |
| Old K's Merchandise Share | 22.50% | 2,281,245.69 |

| | | |
|---|---|---|
| If Old K's Sharing Less than $3 million then Guarantee of $3M is the floor | | 3,000,000 |
| Total Due to Old K's Merchandise | | 3,000,000 |

The Reconciliation provides a "Calculation of Wire" as

follows:

| Distribution Made March 2008 | 3,000,000.00 |
|---|---|
| **Less Amounts Due New K's / GB:** | |
| Fee for Busey Guarantee Agreement | 800,000.00 Due to GB |
| Old Champaign Settlement | 175,000.00 Due to GB |
| Don Oulette Settlement | 71,923.00 Reimbursement to New K's |
| Rick Powers Severance Payment per Contract with Old K's | 45,360.00 Reimbursement to GB |
| Busey Forbearance Renewal | 7,500.00 Reimbursement to New K's |
| Busey Forbearance Renewal | 10,000.00 Reimbursement to New K's |
| Busey Forbearance Renewal thru Oct 2007 | 10,000.00 Reimbursement to New K's |
| Busey Forbearance Renewal Thru Jan 2008 | 10,000.00 Reimbursement to New K's |
| AR Accounts for Kay Eldridge | 11,354.53 Payment due to New K's for AR |
| Reserve | 100,645.47 Reserve |
| Subtotal Deductions | 1,251,783.00 |
| **Total Amount Funded to K's Merchandise Mart Inc.** | 1,748,217.00 |

### b.   *The Real Estate*

The Reconciliation lists two pieces of property, the "Davenport Real Estate" and the "Decatur Land," which had not been sold at the time the Reconciliation was prepared.  It valued each at "0.00."  After December 31, 2008, the "Decatur Land" was sold for a net revenue to New K's of $16,705.47.  The Davenport Real Estate remains unsold.  Patricia Parent, a Principal and Managing Director of GBG, stated that it is currently listed for sale at $1,900,000.  David Coles, who submitted an expert report on behalf of GBG, estimated that the property value was $1.5 million.

### c.   *The $1,075,645.47 Liability*

The Reconciliation identifies $1,075,645.47 as a liability. This number includes $800,000 which was due from Old K's to GBG and was paid out of the distribution to Old K's.  It includes $175,000 for the settlement of liabilities in connection with the Old Champaign Store which was due from Old K's to GBG and was paid out of the distribution to Old K's.  Finally, it includes another $100,645.47 in reserve for payments for preparation of Old K's income tax returns, state income taxes owed by Old K's, annual report fees owed by Old K's and other miscellaneous billings that might be discovered on review.

Parent stated in an affidavit that these amounts were listed as liabilities because they were owed to others (GBG or third parties) and being held by New K's.  She stated that the amounts were also included as assets, because New K's had not yet paid the amounts and therefore held them in its accounts.  She stated that the $1,075,645.47 was a part of the asset line item identified as "Bank of America Cash," which totaled $6,817,471.77.  Regarding the reserve in particular, she stated that New K's was only holding the $100,645.17 in cash until Old K's expenses were paid, and to the extent that any amounts were left over, they would be repaid to Old K's.

    d.   The $130,777.53 in Deductions

The Reconciliation provides a calculation of the distribution made to Old K's.  The calculation includes deductions for the payment of a settlement with Don Oulette, forbearance fees on New K's on mortgages, and accounts receivable, which were sums owed by Old K's and Kay Eldridge (a principal shareholder of Old K's) to New K's.  These deductions total $130,777.53.

Parent stated that the first two deductions represented reimbursements for expenses New K's had already paid out on Old K's behalf.  They were not included as either liabilities or assets because receipt of the reimbursement did not generate

11

revenue or a new asset but instead canceled out prior
expenditures.  She stated that the final component, representing
accounts receivable owed by Kay Eldridge, was originally one
asset (accounts receivable), and after payment to New K's through
the deduction became another asset (cash).  She stated that
because the amount was already considered an asset when it was
accounts receivable, it would not increase New K's assets after
payment was taken out of the Old K's distribution.  She stated
that the accounts receivable therefore were reflected in the
cash assets without increasing New K's gross revenues.

### e.  The Inventory Balance

The Reconciliation provides a zero inventory balance as of
December 31, 2008.  Old K's expert Michael Pakter, however,
provided a report stating that this number was incorrect.  Mr.
Pakter calculated that the ending inventory should be equal to
the opening inventory plus the purchases less the cost of sales.
Into this formula, he plugged numbers derived from (1) the
ending inventory balance of Old K's as of April 30, 2006 (used as
the opening inventory of New K's); (2) an "Inventory Update
Summary" report created by GBG (used for the purchases numbers);
and (3) other internal GBG documents.  Using these numbers, he
calculated that the ending inventory should have been

$13,923,576.  In other words, Pakter concluded that over $13.9 million worth of inventory was unaccounted for by GBG.

Parent stated that the numbers that Pakter plugged into his formula did not represent opening inventory or purchases.  She stated that not all of Old K's inventory balance was brought over to New K's on May 1, 2006 when it commenced operations, and that specific items of inventory were excluded from the transaction. For this reason, the ending inventory balance of Old K's was not the opening inventory of New K's.  She also stated that the "Inventory Update" report at GBG, the source of Pakter's numbers for monthly "purchases," was an operational report that did not reflect "purchases" but instead tracked the total amount of inventory physically present in the store.  Thus, it included inventory that was at the stores but was not an asset, much like consignment inventory that was not owned by New K's.  Finally, she stated that at least one data point for ending inventory (that for December 31, 2006) was taken from the wrong point in time (namely from the week ending December 17, 2006).

GBG expert Jeffrey Szafran submitted a report criticizing Pakter's analysis in much the same way as Parent did.  Szafran stated that "the basic accounting equation used by Mr. Pakter is reasonable" but "certain data points used in the analysis were wrong."

Szafran explained that the opening inventory balance was wrong because it reflected the ending inventory balance of Old K's instead of the opening inventory balance of New K's.  He stated that Pakter's use of the wrong balance improperly inflated his ending inventory calculation by approximately $2 million. *Id.*  Szafran cited to work papers produced by Buccino & Associates, Inc., which was engaged to identify the assets and liability that were to be transferred from Old K's to New K's, and concluded that a "downward adjustment of approximately $2.1 million" should have been made.  *Id.*  Szafran did not provide Old K's with a copy of the Buccino & Associates work papers.

Szafran also stated that the "purchases" data points used by Pakter were obtained from the "Inventory Update Summary" produced by GBG, which did not reflect assets correctly but instead analyzed all orders and perpetual merchandise on hand. He stated that this did not represent New K's inventory balance, because, for example, it included consignment product.  For his information regarding the numbers in the Inventory Update Summary, he cited a conversation with GBG employee Rhonda Hebert.

Szafran stated that Pakter's cost of goods numbers were also incorrect, and were taken from New K's operational "sales summary" reports instead of from its general ledger accounting

system, J.D. Edwards.  He noted that the sales summary reports provided numbers that could not appropriately be used for the "cost of goods" data points because they included layaway sales that were not a part of "cost of goods" prior to the ultimate purchase by the customer.  He stated at his deposition that he was able to understand why there was a difference between the GBG operational data and the accounting records after speaking with Sherry Wittig, a GBG accounting employee.

Szafran provided his own inventory analysis, relying on the same accounting principles as those used by Pakter but using data points from New K's general ledger accounting system, J.D. Edwards.  His analysis showed an ending inventory number of $580,000.  He explained that "[t]he cumulative difference in my expected ending inventory amount did not differ substantially from the reported ending inventory, therefore I did not attempt to reconcile the difference."  *Id.*

### f.   Updates to the Reconciliation

At her deposition on March 25, 2010, Rhonda Hebert, the GBG employee responsible for creating the Reconciliation, stated that GBG was working on updates to particular parts of the document, namely how an $11.7 million advance to K's was documented and updates to a valuation to correct certain

15

estimates.  GBG has not provided Old K's with an updated version

of the Reconciliation.

    <u>4.</u>   <u>The Emails Regarding Financial Projections and Accounting</u>

On January 19, 2007, Rhonda Hebert emailed Tricia Parent,

Billy Weinstein, and Frank Morton of GBG.  The email stated:

> Attached is a revised estimated recovery on the
> balance sheet for your review
> With the changes implemented, the bottom line is
> current showing: 7,937.
> Please advise of an changes/reprojections that need to
> be made.

On January 20, 2007, Frank Morton forwarded the January 19,

2007, email to Parent and included his own email:

> A few weeks we sat done with Rhonda and reviewed the
> P&L (12/29 updated) . . . and we also discussed
> several circumstances where we felt the P&L was
> conservative including the following:
> Sales- plan had 178mm, we did $181.2mm (obviously some
> COGS here on the memo)
> Paduca loss overstated (100k)
> Payroll overstated (500k)
> G/C liability overstated (300k)
> Bessler add back (400k)
> Windown overstated (1mm)
> VBO (250k)
> Obviously, we need a true picture here to see if we
> should buy out the back end . . . . Seems like we
> should be in the $17.0-$17.5mm range for total JV, not
> included the financing of $1.5mm to GB, with a break
> of $13.3mm.

*Id.*

Later that day, Parent responded to Morton with the

following email:

As you are probably are aware we have a lot of people
using different numbers not understanding what is in
or what is out.  Billy is saying one thing for [Old K's
attorney] Cobb, we have one set of numbers for Rick
etc...nothing has changed between the numbers we have
published between us.  if you want to go over we can
at your convience, but understand we are following on
the same path we have discussed.

On January 21, 2007, Morton responded to Parent with the

following email:

I understand, we just need to get a clear picture of
the numbers, so wan make a judgment on the buyout of
the backend.  this has nothing to do what we share
with [Old K's attorney] Cobb et al...
I want to buy it out but I also don't want to be
stupid.  If you can look at the numbers and give your
opinion, I'd appreciate

Parent stated at her deposition that the reason for the

overstatement of the items listed in Morton's January 20, 2007,

email was that projections are formulated to leave room for any

unexpected expenses that can be incurred.  She further explained

the chain of emails by stating:

It's not uncommon that our people that are not close
to the numbers are all using different numbers.  For
whatever reason, people that are not looking at
financial statements and what is going through the
books and records have numbers in their heads, okay?
I believe at the time we received something from Rick
Powers, who was actually working on behalf of New K's,
created a document that was completely incorrect.  So
what I'm telling Frank is, you're saying one thing,
Rick's saying something else, and we've got a set of
books that the company has.

17

She stated that she did not know what her understanding was of what Morton meant when he emailed "this has nothing to do with what we share with Cobb . . . ."

**B.   *Procedural Background***

Plaintiffs commenced this case on July 22, 2008, filing a Complaint containing three counts: (1) fraudulent inducement, (2) accounting, and (3) breach of contract.  Included within the breach of contract count was a claim for breach of the implied covenant of good faith and fair dealing.

### 1.   Damages Disclosures

On December 24, 2008, Plaintiffs filed initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A).  In response to the requirement that each party provide "a computation of each category of damages claimed by the disclosing party," Fed. R. Civ. P. 26(a)(1)(A)(iii), Plaintiffs stated:

> Plaintiffs have been damaged by Defendants failure to provide an accounting, compensatory and exemplary damages as a result of Defendants' breach of the LLC Agreement, fraud, and their attorney fees and expenses in bringing this suit.  Plaintiffs cannot determine the amount of the damages until Defendants provide Plaintiffs their document production responses and an accounting . . . .

On June 11, 2009, Plaintiffs responded to Defendants' First Set of Interrogatories, which were served on March 5, 2009. Interrogatory 13 stated:

18

> Please describe in detail including exact dollar
> amount each and every element of damages the
> Plaintiffs are claiming in this action and identify
> each and every document that the Plaintiffs rely on in
> responding to this interrogatory.

Plaintiffs responded with the following:

> The exact dollar amount of damages cannot be
> determined at this time prior to the completion of
> Defendants' discovery disclosures and expert economic
> analysis.  Investigation continues and Plaintiffs will
> supplement their response to this interrogatory as
> information becomes available.

Plaintiffs never supplemented this interrogatory response.

On March 19, 2010, Plaintiffs served Defendants with

supplemental disclosures pursuant to Fed. R. Civ. P.

26(a)(1)(A). Plaintiffs' response to the requirement to provide

a calculation of damages was unchanged from the response that

they provided on December 24, 2008.  Plaintiffs never served a

further supplemental disclosure.

On June 15, 2010, Plaintiffs served Defendants with Michael

Pakter's "Expert Report on Lost Profits of New K's Furniture

Department."  In the report, Pakter stated that it was his

opinion:

> with reasonable degree of certainty, from an
> accounting and financial analysis point of view, if
> the Court finds that Gordon Brothers Group, LLC
> ("Gordon Brothers") failed to act with the standard of
> good faith and fair dealing in operating the New K's
> Furniture Department and/or otherwise liable for the
> damages Plaintiffs suffered, the measure of Plaintiffs'
> damages, assuming New K's was engaged in normal
> business operations from May 1, 2006 through October

4, 2006, was New K's Furniture Department lost profits in the amount of $1,137,789.

On June 15, 2010, Plaintiffs also served Defendants with Michael Pakter's "Expert Report on Count II (Accounting)."  In the report, Pakter evaluated the completeness and quality of the financial records provided to Plaintiffs by GBG and found the records wanting.  He did not provide a damages calculation related to Count II.  He explicitly stated:

> Plaintiffs' legal counsel has not requested that I compute and/or otherwise determine the monetary amount of Plaintiffs' direct, incidental and/or consequential damages sustained as a proximate result of Gordon Brothers' failure to provide an accounting.

At his subsequent deposition on October 20, 2010, Pakter reiterated that he was not opining and did not opine about the damages suffered by Plaintiffs due to GBG's failure to provide adequate accounting.

Pakter submitted an additional report, dated August 31, 2010, and entitled "First Supplemental Expert Report on Count II (Accounting)."  In the report, he provided calculations based on various GBG financial records and stated that it was his opinion:

> with a reasonable degree of certainty, from an accounting and financial analysis point of view, that Gordon Brothers failed to specifically, fully and completely account for inventory of New K's in the amount of approximately $13.9 million from May 2006 through January 2007.

He further stated:

> Plaintiffs' legal counsel has not requested that I
> compute and/or otherwise determine the monetary amount
> of Plaintiffs' direct, incidental and/or consequential
> damages sustained as a proximate result of Gordon
> Brothers' failure to account for this amount of
> inventory.

At his subsequent deposition, Pakter stated that the $13.9

million figure "may" be owed as monetary damages to Plaintiffs,

but that he had not been asked to compute whether the figure

constituted damages.  He reiterated: "I'm simply pointing out

that there's 13.9 million dollars unaccounted for, it would seem

in the inventory."

Fact discovery terminated on May 15, 2010.  Expert

discovery terminated on December 14, 2010.

On September 9, 2011, after I issued a decision on

Defendants' Motion for Partial Summary Judgment, the parties

submitted a Joint Status Report.  In the report, Old K's stated:

> As set forth in the evidence, the amount improperly
> calculated is $5 million, the amount of damages
> related to furniture is $1.1 million, and the amount
> of missing inventory is $13.9 million.  Applica[t]ion
> of the LLC Agreement formula yields damages to Old K's
> of $4.5 million.

Old K's provided additional detail regarding the $5 million

"improper calculations" damages, asserting:

> Based on the Complaint and record evidence, Plaintiff
> claims that the "Accounting" was off, at least, by $5
> million: $231,423 in New K's assets listed as
> liabilities, $1,075,645 in assets of Gordon Brothers

21

to be deducted from the liquidating distribution
listed as liabilities to New K's, and $3.7 million for
not assigning a value for real estate assets held by
New K's.

2.   Defendants' Motion for Partial Summary Judgment

On January 14, 2011, Defendants filed a motion for partial

summary judgment pursuant to Fed. R. Civ. P. 56.   Defendants

moved for an order:

(i)   dismissing Count I of the complaint, which asserts
      plaintiffs were fraudulently induced into entering
      into the New K's Merchandise LLC Limited Liability
      Company Agreement, dated as of May 1, 2006 (the "LLC
      Agreement");
(ii)  dismissing Count III of the complaint, to the extent
      that it purports to assert a claim for breach of the
      implied covenant of good faith and fair dealing
      arising out of the LLC Agreement;
(iii) striking plaintiffs' demand for "benefit of the bargain"
      damages; and
(iv)  dismissing for lack of standing the claims of
      individual plaintiffs David Kay Eldridge, Ray
      Eldridge, Jr., D. Chris Eldridge as trustee of the C.
      Eldridge 1994 GST Trust, and Patricia K. Sammons as
      trustee of the P.K. Sammon 1994 Trust.

In support of the component of the motion moving to dismiss the

claim for a breach of the implied covenant of good faith and

fair dealing, Defendants argued that (1) Plaintiffs did not

allege the breach with sufficient specificity and (2) any

suggestion by Plaintiffs' expert that Defendants had breached an

implied contractual obligation to undertake an operational

turnaround of New K's failed as a matter of law.

22

In their opposition, Plaintiffs argued that "[i]n the complaint, K's identified the obligations imposed on Gordon by the duty of good faith and fair dealing that were breached and the resulting damages . . . ." Plaintiffs did not specify or otherwise elaborate on what statements in the Complaint identified these obligations. Plaintiffs then argued that there were specific provisions in the LLC Agreement giving rise to GBG's duty to undertake an operational turnaround of K's Merchandise.

At oral argument on the Motion for Partial Summary Judgment, after discussing Plaintiffs' claim that Defendants breached the implied warranty of good faith and fair dealing, Plaintiffs' counsel and I had the following exchange:

> THE COURT: . . . . You say that they did not use their discretion properly to effect liquidation. That is really what it comes down to, right?
> MR. PATTERSON: That is one thing, and they also made a series of operational decisions that were also not in good faith, the failure to purchase the inventory, which we have submitted affidavits on, that tended to drive K's customers away, ordering furniture that wouldn't appeal to K's market, and that was a subject of a previous liquidation, that there is no way in heck anybody operating in good faith could think would sell in K's store. There are operational issues as well as the decision to liquidate.
> THE COURT: So, your overarching theory, then, is that they engaged in a process of willfully making liquidation inevitable.
> MR. PATTERSON: They did that.
> THE COURT: Is that what it comes down to?
> MR. PATTERSON: I just want to be careful, though, before I say what it comes down to.

23

>THE COURT: It has got to come down to something.  What
>this is is a vast collection of resentments that are
>congealed into a complaint, and I am looking for the
>theme.
>MR. PATTERSON: The theme is that they misrepresented
>us going in, and then operationally guaranteed the
>result and failed to exercise good faith and lied to
>us throughout . . . .

On August 4, 2011, I issued a Memorandum and Order ruling

on Defendants' Motion for Partial Summary Judgment.  I held that

the Complaint's statement that GBG "breached the contractual

covenant of good faith and fair dealing implied [in] the LLC

Agreement when it engaged in the [alleged] fraud and

mismanagement" was sufficient to allege a breach of the implied

warranty of good faith and fair dealing.  However, I held that

the implied covenant did not include a warranty not to liquidate

the LLC under the facts presented in the case.  I concluded that

"the implied covenant claim fails as a matter of law."  I also

granted the other parts of Defendants' motion for summary

judgment on Count I (fraud), striking Plaintiffs' demand for

benefit of the bargain damages, and dismissing David Kay

Eldridge, Ray Eldridge, D. Chris Eldridge, and Patricia Sammons

from the case.

In the parties' Joint Status Report filed on September 9,

2011, the remaining Plaintiff, Old K's, asserted that among the

remaining claims was a claim that Defendants had "breach[ed] the

24

contractual duty to consult and the implied covenant of good faith and fair dealing during the operation of the business."

### 3.   Pending Motions

At a status hearing before me on September 22, 2011, Defendants expressed a desire to file a motion for summary judgment on the remaining claims, and I set a schedule for that motion.  Plaintiff expressed no such desire or plans.  However, on October 5, 2011, Plaintiff filed a motion for leave to file a cross-motion for summary judgment.  I granted the motion, but in my order warned that "[c]ounsel . . . is advised to consider the application of Fed. R. Civ. P. 11 to any such motion if the motion has no conceivable likelihood of success."  Electronic Order of October 7, 2011.

Defendants moved for summary judgment on the following grounds: (1) the claim for breach of an implied covenant has already been dismissed; (2) the claim for breach of contract for failure to consult with Old K's does not provide any measure of damages that is not impermissibly speculative; (3) the claim that Defendants did not keep Old K's sufficiently apprised of the financial condition of New K's is moot, given pre-trial discovery, and moreover does not provide for calculable damages; and (4) the claim for breach of contract for failure to pay an appropriate liquidating distribution should be dismissed because

it is based on damages calculations that should be stricken and does not accord with undisputed facts.

Plaintiff moved for summary judgment on the following grounds: (1) Defendants have breached the LLC Agreement by failing to provide Old K's with the proper liquidating distribution and (2) Defendants breached the covenant of good faith and fair dealing during the operation of the LLC by mismanaging the furniture department.

Following Plaintiff's filing of its motion for summary judgment, Defendants filed a motion for sanctions.  Defendants asserted that Plaintiff's motion has no conceivable likelihood of success, was untenable as a matter of law, and was presented for an improper purpose.  Defendants contended that Plaintiff's counsel should be sanctioned pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.

## II. CHOICE OF LAW

Federal courts sitting in diversity "apply state substantive law and federal procedural law." *Hanna* v. *Plumer*, 380 U.S. 460, 465 (1965).  The numerous procedural issues that arise in this case are governed by First Circuit and Supreme Court precedent.  With respect to substantive law "[a]s we are a federal court sitting in diversity, we apply the forum state's choice of law rules." *Hartford Fire Ins. Co.* v. *CNA Ins. Co.*

*(Europe) Ltd.*, 633 F.3d 50, 54 n.7 (1st Cir. 2011).  Here, "the forum state is Massachusetts, which, absent any contravening public policy, honors choice-of-law provisions in contracts." *Id.*  The LLC Agreement states that the "[a]greement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware."  LLC Agreement, § 16(c).  I discern no reason and the parties do not present any reason to reject the parties' contractual choice of Delaware law.

### III. STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (quoting *Rodríguez-Rivera* v. *Federico Trilla Reg'l Hosp.,* 532 F.3d 28, 30 (1st Cir. 2008)).

In evaluating a motion for summary judgment, a court "must construe the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor

while safely ignoring conclusory allegations, improbable inferences, and unsupported speculation." *Collins* v. *University of New Hampshire*, 2011 WL 6350429, at *4 (1st Cir. 2011).  ("The presence of cross-motions does not alter this general standard. When there are cross-motions for summary judgment, the court must consider each motion separately, drawing all inferences in favor of each non-moving party in turn."  *D&H Therapy Associates, LLC* v. *Boston Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011).

## IV. ANALYSIS

### A.   *Implied Covenant of Good Faith and Fair Dealing*

Plaintiff contended that its claim for breach of the implied covenant of good faith and fair dealing regarding mismanagement of the furniture department[2] was not dismissed by this Court.  Plaintiff argued that Defendants' motion for partial summary judgment and its supporting papers never mentioned Old

---

[2] Although Plaintiff does not expressly argue in its own Motion for Summary Judgment that the alleged inventory accounting problems provide a third basis for the implied covenant claim, it somewhat ambiguously appears to do so in its Opposition to Defendants' Motion for Summary Judgment.  To the extent that Plaintiff is making this argument, any such basis was disposed of when I dismissed the claim for breach of the implied covenant of good faith and fair dealing.  Furthermore, any such basis is also subject to dismissal due to Plaintiff's failure to disclose the damages calculation related to the claim in a timely manner. *See infra* Section III(D)(1).

K's claim as it relates to mismanagement, that Old K's therefore

did not respond to an argument that was not made, and that I did

not address the issue in my decision because it was not part of

the motion.

Plaintiff mischaracterizes Defendants' earlier motion for

partial summary judgment.  The motion clearly requested the

Court to "dismiss[] Count III of the complaint, to the extent

that it purports to assert a claim for breach of the implied

covenant of good faith and fair dealing arising out of the LLC

Agreement."  The motion thus addressed the *entirety* of

Plaintiff's implied covenant claim.  In its Opposition,

Plaintiff did not raise the mismanagement allegations or argue

that the allegations provided a separate basis on which the

implied covenant claim could (at least partially) be maintained.

The First Circuit requires a litigant to raise all

arguments in its opposition to a dispositive motion or waive the

right to raise them thereafter.  In one leading case, it

observed that:

> [t]o cinch matters, the plaintiffs made no mention of
> [this] claim in their opposition to the [defendant]'s
> dispositive motion.  As we wrote in a comparable case,
> "[c]ourts are entitled to expect represented parties to
> incorporate all relevant arguments in the papers that
> directly address a pending motion."  This branch of the
> raise-or-waive rule serves the salutary purpose of
> preventing litigants from gaming the system by seeding
> complaints with Delphic references in the hope of
> facilitating an escape should the district court's

> ruling on their advertised claims fail to suit.
> Applying that principle, we conclude that the
> plaintiffs' failure to mention--let alone adequately to
> develop--the . . . theory in their opposition to the
> [defendant]'s dispositive motion defeats their belated
> attempt to advance the theory on appeal.

*Iverson* v. *City of Boston*, 452 F.3d 94, 103 (1st Cir. 2006).

Plaintiff did not raise operational decisionmaking as an

independent ground for the good faith and fair dealing claim in

its opposition to Defendants' motion for partial summary

judgment.  Plaintiff may have come to regret that decision, but

it may not belatedly reverse its choice.

To be sure, Plaintiff did mention mismanagement in its

complaint.  Plaintiff's counsel even raised mismanagement —

albeit briefly — at oral argument on the motion for partial

summary judgment.  However, counsel discussed the mismanagement

in the context of "operationally guarantee[ing]" liquidation —

unwarranted liquidation being the basis of Plaintiff's original

implied covenant argument.  Counsel did not assert that the

alleged mismanagement constituted an independent ground for the

finding of a breach.  Applying the "raise-or-waive" rule, I hold

that the mismanagement argument was waived and will not consider

it or the implied covenant claim any further.

**B.   *Accounting***

Count II of the Complaint alleged that Defendants did not

provide Plaintiff with an accounting of the financial condition

and operations of New K's as required by the LLC Agreement.

Plaintiffs requested "production of the books and records

requested by Plaintiffs but not yet made available by Defendants

and an accounting and award Plaintiffs such other relief as this

Court deems just and proper."  After Plaintiff filed the

Complaint, the parties engaged in a period of discovery for

approximately two years, during which Plaintiff could and did

request financial books and records from Defendants in the

course of document production.

Defendants argued that to the extent that Defendants

withheld financial information that it was required to share

under LLC Agreement, the issue is now moot due to extensive

document production.  Defendants further argued that Plaintiff

never articulated any other damages for its "Accounting" claim,

and so the claim should be dismissed.  Plaintiff did not respond

to these arguments.

The discovery conducted in this case has been time-

consuming and comprehensive.  No motion to compel additional

discovery is pending; Plaintiff does not assert that it is

missing any particular document in Defendants' possession.  Given

Plaintiff's failure to articulate any demands for damages or

equitable relief pursuant to Count II of the Complaint, I

granted Defendants summary judgment on Count II.

*C.    Failure to Consult with Old K's*

Count III of the Complaint alleged that GBG failed to "use its best efforts to consult with K's Merchandise regarding [GBG]'s conduct of the affairs of the Company and . . . use its best efforts to keep each Member fully informed of any material decisions and activities of [GBG] with respect to the Company" as required by § 3(a) of the LLC Agreement.  However, Plaintiff never provided a measure of the damages sought in compensation for this alleged breach of contract.

Defendants argued not only that Plaintiff has provided no measure of damages for this claim, but additionally that it is impossible to imagine a measure of damages that would not be unduly speculative.  Plaintiff did not respond to this argument. Plaintiff provided no theory for how a Court, or a jury, might decide whether consultation would have led to different decisions in the operation of the business, if those decisions would have led to different profits, or what those profits might have been.  I am hard-pressed to imagine what such a theory might be, and without one, I hold that any claim for damages based on this breach of contract is unduly speculative. Additionally, I find that, considering that Plaintiff did not advance either a number or a theory regarding damages for this alleged breach and that Plaintiff has not responded to

32

Defendants' argument, Plaintiff has conceded the point and waived the claim.

Accordingly, I granted summary judgment to Defendants on Count III of the Complaint to the extent that it asserts a breach of contract for Defendants' failure to consult adequately with Plaintiff and keep Plaintiff informed of decisions and activities with respect to the LLC.

### D.   *Failure to Disclose Money Damages Claims*

Defendants contended that Plaintiff failed to disclose the money damages that it sought for its breach of contract claim as required under Fed. R. Civ. P. 26 and as requested in Defendants' interrogatories.   Defendants moved that Plaintiff's damages evaluations for its breach of contract claims, revealed generally to Defendants and to the Court for the first time in the September 9, 2011, Joint Status Report, be stricken.   Such an order by this Court had the effect of dismissing the claim for breach of contract, because it eliminated the grounds for Plaintiff's request for relief.

Plaintiff was undoubtedly obligated to provide a calculation of the damages sought.   Under Fed. R. Civ. P. 26(a), Plaintiff was required to provide initial disclosures to Defendants, including "a computation of each category of damages claimed" and "the documents or other evidentiary material, unless

privileged or protected from disclosure, on which each

computation is based, including materials bearing on the nature

and extent of injuries suffered."  Fed. R. Civ. P.

26(a)(1)(A)(iii).  Plaintiff was also required to respond to

Defendants' interrogatories, which included an interrogatory

requesting a description of the "exact dollar amount [of] each

and every element of damages the Plaintiffs are claiming in this

action" and an identification of "each and every document that

the Plaintiffs rely on in responding to this interrogatory."

Plaintiff stated in response to both the initial disclosure

requirement and the interrogatory that it could not yet

determine the amount of damages.

Plaintiff was additionally under an obligation to

supplement those disclosures and responses.  Fed. R. Civ. P.

26(e) provides:

> A party who has made a disclosure under Rule 26(a) —
> or who has responded to an interrogatory, request for
> production, or request for admission — must supplement
> or correct its disclosure or response . . . in a
> timely manner if the party learns that in some
> material respect the disclosure or response is
> incomplete or inaccurate, and if the additional or
> corrective information has not otherwise been made
> known to the other parties during the discovery
> process or in writing . . . .

Fed. R. Civ. P. 26(e).  The required Rule 26(e) supplementation

"should be made at appropriate times *during the discovery*

*period*." Rule 26(e), Advisory Committee Note, 1993 Amendments (emphasis added).

Here, Plaintiff did not supplement either its initial disclosure or its interrogatory response by providing a measure of the damages sought.  Moreover, Plaintiff served Defendants with supplemental initial disclosures on March 19, 2009, and did not change its response to the damages disclosure requirement. Providing the calculation of damages for the first time months after the close of fact and expert discovery is not timely.

The violation of the automatic discovery provisions of Fed. R. Civ. P 26(a) and 26(e) triggers sanctions pursuant to Fed. R. Civ. P. 37(c).  *See, e.g., Ortiz-Lopez* v. *Sociedad Espanola de Auxilio Mutuo*, 248 F.3d 29, 33 (1st Cir. 2001) (Rule 37(c)(1) sanction "is a 'self-executing sanction for failure to make a disclosure required by Rule 26(a)").  The Rule states:

> If a party fails to provide information or identify a
> witness as required by Rule 26(a) or (e), the party is
> not allowed to use that information or witness to
> supply evidence on a motion, at a hearing, or at a
> trial, unless the failure was substantially justified
> or is harmless.

Fed. R. Civ. P. 37(c).  In addition to or instead of this sanction, the court may impose other appropriate sanctions, including but not limited to ordering payment of reasonable expenses caused by the failure, informing the jury of the party's

failure, or any of the sanctions listed in Rule 37(b)(2)(A)(i)-(vi).  *Id.*

Preclusion is "not a strictly mechanical exercise." *Esposito* v. *Home Depot U.S.A., Inc.*, 590 F.3d 72, 77 (1st Cir. 2009).  However, "it is the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with the Rule was either justified or harmless and therefore deserving of some lesser sanction." *Wilson* v. *Bradless of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001).  "'Substantially justified does not mean 'justified to a high degree,' but only 'justified in substance or in the main — that is, justified to a degree that could satisfy a reasonable person.'" *Sheppard* v. *River Valley Fitness One, L.P.*, 428 F.3d 1, 12 (1st Cir. 2005) (internal citation omitted).  The harmlessness inquiry involves balancing "fairness, burden, and case management needs." *Gagnon* v. *Teledyne Princeton, Inc.*, 437 F.3d 188, 198 (1st Cir. 2006).

Plaintiff must address its failure to disclose two sets of damages calculations.  First, Plaintiff must justify its failure to disclose its damages calculations regarding the alleged missing inventory.  Second, Plaintiff must justify its failure to disclose its damages calculations regarding the alleged

faulty accounting in the Reconciliation.  I will consider each set of calculations in turn.

### 1.  Missing Inventory

Plaintiff claimed that GBG breached its obligations under the LLC Agreement to share profits because its documents did not account for $13.9 million of inventory.  It relies on a report entitled "First Supplemental Expert Report on Count II (Accounting)" and prepared by its expert, Michael Pakter, purporting to identify the mistaken (or purposely misleading) accounting.  However, Pakter denied in his report and at his deposition that his calculations were intended to serve as a damages determination.  He did state that the figure "may" be owed as monetary damages to Plaintiff.  It was not until after discovery had concluded that in the parties' September 9, 2011 Joint Status Report Plaintiff stated that it was seeking its share of $13.9 million in missing assets under Count III for breach of contract.

Plaintiff argued that, for all intents and purposes, it did provide the damages measure, because Defendants could use simple arithmetic to determine what damages Defendants would owe Plaintiff if a jury found that there were $13.9 million in unaccounted-for assets.  According to the Reconciliation, New K's expected revenue was $10,138,869.74.  Plaintiff would be due

22.5% of the sum of that expected revenue and the additional
$13.9 million, less the three million minimum already paid.  In
short, under that calculation, Plaintiff would be due somewhat
less than $2.5 million.

Plaintiff missed the heart of the problem.  Pakter's expert
report asserted a $13.9 million asset shortfall in support of
Count II, the accounting claim.  Pakter did not assert that the
number was the basis of a claim under Count III of the Complaint
for breach of contract.  If Pakter had done so, Plaintiff would
still have had to explain how the $13.9 million figure was
related to the damages sought.  Plaintiff argued that the
damages calculations would be based on the $13.9 million figure,
which was the cost of acquisition of the alleged missing
inventory.  However, in Delaware the standard measure of damages
for a breach of contract is expectation damages.  *Comrie* v.
*Enterasys Networks, Inc.*, 837 A.2d 1 (Del.Ch. 2003).

Defendants suggest that the proper calculation of
expectation damages would require a determination of the
expected net sales proceeds for this amount and mix of inventory
in a going-out-of-business scenario.  Another possible
measurement of expectation damages might be the fair market
value of Old K's share of the inventory.  If the inventory had
not disappeared from the LLC's financial documents (and perhaps

from its warehouses; Plaintiff is never quite clear about the way by which the inventory went "missing") and had remained as an asset of the business, it could have been distributed in kind under § 6(d) of the LLC Agreement.  Plaintiff would have received its share of the inventory as distributed based on its fair market value; it then would have owned assets which could be evaluated based on fair market value.[3]  That valuation would provide a manner of awarding expectation damages without the speculation contemplated by Defendants regarding how these items might have been priced and what revenue they might have raised at a going-out-of-business sale.

While I need not determine the correct measure of expectation damages here, the discussion underscores the degree to which Plaintiff omitted even the rudiments of a damages calculation until the Joint Status Report, and that the omission was neither substantially justified nor harmless.  Plaintiff does not claim substantial justification or harmlessness,

---

[3] It is possible that, had this issue gone to trial, the cost of acquisition would have been the best estimate of fair market value given the information available--that is, it is possible that the $13.9 million figure ultimately might have served as the basis for a damages award.  However, because Plaintiff did not claim that the $13.9 million was offered as the basis for breach of contract damages, Defendants were not afforded the opportunity to commission an expert report or conduct depositions with the goal of challenging that figure as the most convincing measure of fair market value.

despite Defendants' statement that the missing inventory claim should be dismissed from the case due to Plaintiff's failure to disclose it as a money damage claim and despite Plaintiff's burden to show that Fed. R. Civ. P. 37(c) preclusion does not apply.  Moreover, even if Plaintiff had attempted to do so, the attempt would have been unsuccessful.

Because Pakter's calculations do not directly translate into damages, and because his calculations were never identified as damages, Plaintiff's failure to supplement either the initial disclosures or the damages interrogatory was not substantially justified.  Plaintiff had a theory of the case and chose not to share it until over a year after fact discovery had terminated and almost nine months after expert discovery had ended. Plaintiff did not communicate the theory even though it was based on (1) calculations that were available to it, at the latest, by the close of expert discovery and (2) GBG financial documents that were available to it, at latest, by the close of fact discovery.

Moreover, Plaintiff's failure is not harmless.  It was not fair for Plaintiff to surprise Defendants with a money damages claim so late in the litigation.  The failure placed a burden on Defendants, who did not have the opportunity to commission their own expert reports on what expectation damages might be for such

a breach, who did not have the opportunity to depose Pakter on issues that might arise due to the use of his calculations as the basis of the breach of contract claim instead of the accounting claim, and who have filed a motion for summary judgment on the basis of the exclusion of this damages claim. The failure affected this Court's docket, because in order to allow such a damages claim without subverting justice, I would be required to re-open the discovery period long-since concluded following which I heard two rounds of motions for summary judgment.

Despite the passage of time, Plaintiff has failed to undertake a showing that the delayed training of a damages theory was neither substantially justified nor harmless; Plaintiff violated its duty of disclosure. "[T]he exclusion of evidence is a standard sanction" for such a violation of case management protocols. *Pena-Crespo* v. *Commonwealth of Puerto Rico*, 408 F.3d 10, 13 (1st Cir. 2005) (internal citations omitted). Nonetheless, Fed. R. Civ. P. 37(c) provides district courts with discretion regarding the appropriate sanction. "The range of sanctions provided in Rule 37(c), from the most harsh (total exclusion and dismissal of the case) to more moderate (limited exclusion and attorney's fees), gives the district court leeway to best match the degree of noncompliance with the

purpose of Rule 26's mandatory disclosure requirements." *Ortiz-Lopez*, 248 F.3d at 34.

A district court should consider a "host of factors, including: (1) the history of the litigation; (2) the sanctioned party's need for the precluded evidence; (3) the sanctioned party's justification (or lack of one) for its late disclosure; (4) the opponent-party's ability to overcome the late disclosure's adverse effects — e.g., the surprise and prejudice associated with the late disclosure; and (5) the late disclosure's impact on the district court's docket." *Esposito*, 590 F.3d at 78.  In this case, these factors militate against Plaintiff.

This litigation has been long and hard-fought; the parties struggled over discovery for approximately two years.  The financial documents on which Plaintiff's damages calculations are based were in Plaintiff's possession, at the latest, by the end of fact discovery, on May 15, 2010.  Plaintiff was under an ongoing obligation pursuant to Fed. R. Civ. P. 26(e) to supplement its initial disclosures and its interrogatory responses, and nonetheless it failed to notify Defendants or the Court of its damage claim for *over a year* after the close of fact discovery.  This is not a case of a single missed deadline; this is a case of continual flouting of an ongoing obligation to supplement.  That factor weighs against Plaintiff.

42

To be sure, Plaintiff has a great need for the evidence at issue.  Its damages calculations are necessary for its contract claim based on missing inventory; without the calculations, Plaintiff makes no legible demand for relief.  That factor decidedly might be said to favor Plaintiff except that factor is a function of Plaintiff's litigation choice.

Plaintiff, moreover, provides no justification for its failure to supplement.  It unconvincingly argues that Pakter's expert report was sufficient basis to justify a failure formally to update its damages calculations.  But Pakter's report addressed a different Count of the lawsuit and Pakter repeatedly outlined that his calculations did not constitute a determination of damages.  That factor weighs against Plaintiff.

As I noted previously, the last two factors--Defendants' ability to overcome the late disclosure's adverse effects (the surprise and prejudice associated with the disclosure) and the late disclosure's effect on this court's docket--weigh against Plaintiff as well.  The discovery period was closed and Defendants could not — in some timely fashion — commission an expert report on damages for the claim.  Nor were Defendants able to depose Plaintiff's expert with the knowledge that his calculation was offered as the basis for a breach of contract claim.  This is a damages determination that can properly be

43

characterized as a "surprise" because, until the Joint Status Report was filed, it was not apparent that Plaintiff was even pursuing a breach of contract claim based on the alleged missing inventory.  Given the procedural posture of the case, any new discovery period that would mitigate such a late disclosure would lead to a singularly disruptive interference with this Court's docket.

I selected a sanction for Plaintiff with the knowledge that because preclusion would "carr[y] the force of a dismissal, the justification for it must be comparatively more robust." *Esposito*, 590 F.3d at 79.  In *Esposito* v. *Home Depot* v. *U.S.A, Inc.*, the First Circuit reversed a preclusion decision with the force of a dismissal where, like here, there were no pre-sanction warnings, where the party never offered a legitimate reason for his late disclosure, where the opposing party "obviously went through the pains of preparing a dispositive summary judgment motion premised on" this lack of the precluded evidence, and where the party's failure to disclose "had a clear effect on the district court's docket." *Id.*  However, in *Esposito* the First Circuit was "presented with a fatal sanction levied for a single oversight;" the party had "missed one deadline and requested an extension of the pre-trial and trial dates after missing that deadline, albeit several weeks after

44

the deadline had passed." *Id.* Here, the oversight was not a matter of a single missed deadline or a delay of mere weeks.

The failure to disclose in this case was a systematic and continuing violation of Plaintiff's obligations under Fed. R. Civ. P. 26(a) that lasted for over a year. It was a failure to inform Defendants not only of the damages calculations, but of an entire basis for a breach of contract claim never clearly asserted in the Complaint, during discovery, or in expert reports.[4] I find that a sanction of preclusion of Plaintiff's damages calculations as they relate to the $13.9 million of alleged missing inventory is warranted in this case. The preclusion, in turn, necessitates dismissal of Count III to the extent that it is based on the alleged missing inventory.

---

[4] Plaintiff's counsel's remarks at the June 15, 2011, hearing on the motion for partial summary judgment indicate that, at the time of the hearing, counsel believed that should Defendants prevail on the motion, the only Count of the Complaint remaining would be Count II (Accounting). While Plaintiff's counsel did not speak conclusively or carefully on the matter, his remarks underscore that Plaintiff itself had not conceived of the theories on which it now seeks damages for breach of contract until after the motion for partial summary judgment was litigated and well after the close of the discovery period. Consequently, it is no coincidence that Plaintiff had not informed Defendants of those theories and the damages that they supported. Such failures to develop the case and inform Defendants of the claims at issue are precisely what Fed. R. Civ. P. 26(a) seeks to prevent.

2.   Reconciliation Calculations

Plaintiff offered a second set of bases for breach of contract damages.  Plaintiff has moved for summary judgment on the breach of contract claim alleging that GBG under-reported its Current Expected Revenue in the Reconciliation by at least $2,823,773.  Plaintiff claims that GBG failed to list as assets: (1) the "Decatur Land," which sold for a net revenue to New K's of $16,705.47; (2) the "Davenport Real Estate," which is currently listed for sale and was valued by Defendants' expert David Coles at $1.5 million; (3) $975,000.00 that was being held by New K's on behalf of GBG and is listed as a liability on the Reconciliation; (4) $100,645.57 that was being held by New K's as a reserve to pay various fees on behalf of Old K's and is listed as a liability on the Reconciliation; and (5) $130,777.53 that was deducted from Old K's disbursement for expenses New K's had already paid on behalf of Old K's.

Plaintiff again did not disclose the damage calculations based on these alleged accounting errors until the parties submitted the September 9, 2011, Joint Status Report. Nonetheless, Plaintiff contended that it did not violate Fed. R. Civ. P. 26(e).

Plaintiff argued that the Rule requires that a party supplement prior disclosure responses only "if the additional or

corrective information has not otherwise been made known to the
other parties during the discovery process or in writing," Fed.
R. Civ. P. 26(e)(1), and that GBG was made aware of the alleged
problems with the Reconciliations's accounting during the
discovery process.  Plaintiff stated that both Rhonda Hebert and
Patricia Parent were questioned on the miscalculations in the
Reconciliation, and that through those questions the claims and
damages were made known to Defendants.[5]

Plaintiff's argument that GBG was somehow made aware of the
specifics of Defendants' damages claims because its counsel asked
two of out of twelve GBG fact witnesses a very limited number of
questions seeking information about why or whether certain
amounts were counted as liabilities is unreasonable.  Counsel
asked hundreds, if not thousands, of questions of the various
deponents.  Almost none of those questions can be said to have
touched on the theories that Plaintiff pursues today.
Plaintiff's questions about one topic among many during a
deposition did not make damages calculations known meaningfully
to the Defendants or otherwise relieve Plaintiff of its

-------------------------------------------------------------

[5] Plaintiff is disingenuous when it suggests that Defendants'
witnesses were asked about the accounts receivable in a way that
indicated some connection to damages claims.  Hebert was only
asked what the "AR accounts" for Kay Eldridge were, not about
any uncounted asset or unnecessary liability attached to those
accounts.

responsibility to supplement its initial disclosures and interrogatories.

Plaintiff also argues that it could not provide the damages calculations pursuant to Fed. R. Civ. P. 26 because it did not have the information necessary to do so.  Plaintiff states that it could not have included the calculations based on errors in the Reconciliation at the time of the initial disclosures because the disclosures were made before the Reconciliation was provided by Defendants on May 18, 2009.  Plaintiff states that at the time that it responded to GBG's interrogatories, the Reconciliation had been provided less than one month beforehand and a complete analysis had not yet been conducted and could not have been expected.

However, Plaintiff's violation of Fed. R. Civ. P. 26 does not stem primarily from its failure to include the damages based on the alleged errors in the Reconciliation in its initial disclosures or even in its interrogatory responses.  Instead, Plaintiff's violation stems from its failure to supplement those responses for *over two years* following its receipt of the Reconciliation on which its damages theories and calculations were based.  On March 19, 2010, ten months after Plaintiff received the Reconciliation, it served Defendants with supplemental disclosures pursuant to Fed. R. Civ. P.

48

26(a)(1)(A), and it did not identify the damages calculations
based on the Reconciliation.  On May 15, 2010, fact discovery
closed; Plaintiff knew that it would receive no more accounting
documents and would take no more deposition testimony from
Defendants' fact witnesses, and still Plaintiff did not update
its damages calculations.  Plaintiff continually violated its
obligation to supplement its disclosures and interrogatories
under Fed. R. Civ. P. 26(e) by failing to supplement for months
and even years after it received the documents on which its
damages calculations were based.

Finally, Plaintiff argued that it did not violate Fed. R.
Civ. P. 26(e) because the documents supporting the damages
calculation were produced by GBG and "the errors were clear from
the face of the Reconciliation."  Defendants, unsurprisingly,
dispute that there are any errors in the Reconciliation.  Even
if the errors in accounting were obvious (which they were not),
this would not eliminate Plaintiff's obligation to disclose its
damages calculations and the evidentiary material on which they
were based.  Fed. R. Civ. P. 26(e) includes an exception to the
ongoing duty to supplement where the information has been made
known to the opposing party in the course of discovery or in
writing, not where the party claiming the damages believes that
the errors on which the damages are based are "obvious."

Plaintiff contended that even if it has violated Fed. R. Civ. P. 26(e), the violation was substantially justified.  It argues that Old K's did not receive the Reconciliation until May 18, 2009, which was five months after Old K's made its initial disclosures and less than a month before it answered GBG's First Set of Interrogatories.  It states that after receiving the Reconciliation, Old K's counsel continued to request financial information in order to understand the document.  It states that during her March 25, 2010, deposition, Rhonda Hebert stated that GBG was working on updates to some parts of the Reconciliation, and that Old K's never received those corrections.  Plaintiff argues that "[i]t would have been premature and potentially unnecessary for Old K's to update their 26(a) disclosures and interrogatory responses based on a document that Gordon Brothers represented needed correction."

Plaintiff, however, served Defendants with supplemental disclosures on March 19, 2009, which was ten months after GBG sent it the Reconciliation.  While Plaintiff states that its counsel requested additional financial information after receiving the Reconciliation, it also asserts that the errors were plain from the face of the Reconciliation; it is unclear why Plaintiff did not identify those "obvious" errors in the supplemental disclosures and provide calculations of the damages

that Plaintiffs assert that the errors support.  Ms. Hebert's deposition was not conducted until after Plaintiff served its supplemental disclosures, so her statement that certain elements of the Reconciliation were being updated could not have affected the supplemental disclosures.

Plaintiff does not allege that the elements that Ms. Hebert explained were being updated would change the alleged errors or the damages calculations in any way.  It is unclear why the updates would provide a substantial justification for Plaintiff's failure.  Moreover, even if Plaintiff did believe that the updates to the Reconciliation might change the damages calculation, by the time that fact discovery was closed, Plaintiff knew exactly what accounting documents it had received and what materials it possessed on which to base its claims. Nonetheless, Plaintiff still failed to disclose its damages calculations based on the alleged faulty accounting in the Reconciliation for well over a year after fact discovery was closed.  Plaintiff did not demonstrate a substantial justification for its failure to make the required Fed. R. Civ. P. 26(e) disclosures.

Plaintiff argued that its failure to disclose the damages calculations based on the alleged accounting errors in the Reconciliation was harmless.  It argued that there is no

prejudice to Defendants because the damages were based on documents provided by GBG, because discovery does not need to be reopened in order for GBG to address those documents, and because GBG was able to respond to the disclosure in its summary judgment motion and in its opposition to Defendants' summary judgment motion despite the timing of the disclosure. Defendants argue that there is harm because Plaintiff claims that the Reconciliation and GBG's explanations for the Reconciliation are contrary to the principles of accounting, and if the disclosure had been made in a timely manner, GBG could have proffered an expert opinion on accounting to support its contention that the Reconciliation was correct and Defendants' criticisms are unwarranted.

Defendants' response to the allegations of mistaken accounting in the Reconciliation, however, is not a challenge to the accounting principles offered by Plaintiff.  Defendants characterize their arguments as a contention that Plaintiff's position "appears to be based on a misunderstanding of the Accounting entries and basic accounting principles." Defendants' actual response is rooted in factual disputes regarding the nature of various entries in the Reconciliation[6];

---

[6] Defendants' response is also based on a question of contract interpretation which similarly makes no call for an expert

they do not challenge the accounting principles on which
Plaintiff relies.

Defendants could respond to fact questions about the data
in GBG's calculations without resorting to experts.  It is
Defendants' own employees who possess the knowledge of what data
was included within what line item when they created the
Reconciliation.  In fact, Defendants responded to Plaintiff's
motion for summary judgment with an affidavit regarding these
matters of fact submitted by Patricia Parent.

Defendants do not claim that they needed any additional
information from Plaintiff regarding its argument; Plaintiff's
argument is based solely on the documents that Defendants
provided and not on any expert witness report or on information
outside of Defendants' hands.  Because the argument is completely
fact based and the facts are completely within the possession
and knowledge of Defendants' own employees and witnesses,
Defendants do not require any additional discovery in order to
address the argument.

To be sure, Plaintiff failed to disclose this information
in a timely manner.  However, a balancing of fairness, burden,
and case management needs indicates that Plaintiff's failure with

---

witness.

regard to these particular damages calculations was harmless.
Defendants did not lose the opportunity to conduct discovery
where discovery is unnecessary.  The late disclosure had no
impact on this Court's docket because discovery did not need to
be re-opened, because trial had not yet been scheduled, and
because Defendants were able to respond with Parent's affidavit
to the issue when raised in these cross-motions for summary
judgment.  While the late disclosure comes as a surprise —
given that prior to the Joint Status Report Plaintiff had not
only failed to provide the damages calculation but had
additionally failed to disclose this particular basis for the
breach of contract damages to Defendants at all — the factors
balance out such that the delay is harmless.

     Where the late disclosure is harmless, preclusion of the
damages calculation is unwarranted under Fed. R. Civ. P. 37(c).
Given that Defendants fail to articulate any cognizable harm, I
decline to impose any sanction for Plaintiff's failure to
disclose the damages calculations based on the Reconciliation in
a timely manner.

## E.   *Breach of Contract*

     Plaintiff and Defendants both filed for summary judgment
regarding the breach of contract as it relates to the alleged

errors in the Reconciliation.[7]   Plaintiff, however, failed to raise sufficient evidence in support of its theory to evidence a genuine dispute.   First, I will address Plaintiff's attempt to exclude the affidavit of Patricia Parent supporting Defendants' explanation of the Reconciliation and its contents.   Then, I will address in turn each of the five items that Plaintiff alleges were subject to faulty accounting leading to an improper revenue calculation and distribution.

## 1.   Parent's Affidavit

Plaintiff argued that Parent's affidavit explaining the entries within the Reconciliation should be stricken because she "fails to elaborate her personal knowledge of accounting and financial statements, consignment inventory, real estate, the documents created or used, or even the LLC Agreement."   Parent's statements related to the factual substance and basis of the

---

[7] The alleged under-accounting of New K's profits based on these errors is insufficient to raise the revenue above $13,333,333.33, which is necessary in order to justify any damages for breach of contract.   Because the LLC Agreement entitles Plaintiff to 22.5% of the profits, with a distribution minimum of $3 million, 22.5% percent of the profits must exceed the $3 million already distributed (less deductions for debts of Old K's and payments to be made on behalf of Old K's) if Plaintiff is to collect any additional distribution.   However, I address Plaintiff's arguments nonetheless, both for the sake of completeness and because any supplemental distribution warranted by additional revenues as the liquidation process continues will be based in part upon the LLC's current profits.

items within the Reconciliation and accompanying accounting
balance sheets.  She did not need to establish personal
knowledge of general accounting principles or the LLC Agreement;
furthermore, I did not rely on Parent's interpretation of the LLC
Agreement but instead on my own reading of the document itself.
Parent did need to state the basis for her personal knowledge
about the real estate and other entries in the Reconciliation —
and she did so.  Parent stated that she was responsible for
"financial oversight of GBG in the management of the ongoing
business of, and then subsequent and continuing liquidation of,
New K's Merchandise LLC" ("New K's" or the "LLC").  She stated
that she helped prepare the Accounting, including the
Reconciliation.  As one of the preparers of the Reconciliation,
she has demonstrated personal knowledge about its contents.

Plaintiff raises *United States ex rel. Jones* v. *Brigham &
Women's Hosp.*, 750 F.Supp.2d 358 (D. Mass. 2010), in support of
the proposition that Parent's affidavit should not be considered.
In that case, the Relator was rejected as a lay witness because
"almost a hundred percent" of the data he cited came from
another individual, and because his affidavit "contain[ed] no
evidence pertaining to critical issues surrounding the
reliability study; these issues include when and how the
reliability study was conducted, who randomly selected the

twenty-five subjects for the study, and who actually conducted the study." *Brigham and Women's Hosp.*, 750 F.Supp.2d at 368-69. While Parent's affidavit could have been more detailed, it was evident that she financially oversaw New K's and that she helped prepare the Reconciliation and the balance sheets supporting it. That was sufficient to establish personal knowledge about those financial documents in the absence of any evidence to the contrary.

2.   The "Decatur Land"

In the Reconciliation, Defendants valued two parcels of real estate owned by New K's at zero.  Rhonda Hebert of GBG stated that this was because the properties had not yet been sold at the time the Reconciliation was prepared.  Since the Reconciliation was issued, the parcel labeled the "Decatur Land" sold, resulting in net revenues to New K's of $16,705.41.

If these revenues are added to the "Current Expected Revenues" of $10,138,869.74 reported in the Reconciliation, the total updated revenues are $10,155,575.21.  22.5% of the total updated revenues is $2,285,004.42, which remains less than the $3 million minimum established by § 6(b) of the LLC Agreement and already paid out to Old K's (less deductions for debts of Old K's and payments to be made on behalf of Old K's).

The sale of the Decatur Land changes the current revenues; therefore, it affects the total revenues to be calculated when the liquidation of the LLC is finally complete and will affect the amount of any future additional liquidating distribution, if such an additional distribution becomes necessary.  However, the sale of the Decatur Land does not sufficiently change the current revenues of the LLC to warrant an increased liquidating distribution under the revenues as they stand on the record before me, and thus does not provide the basis for a breach of contract claim.  I therefore granted summary judgment to Defendants on the breach of contract claim to the extent that it is based on the alleged under-accounting of the Decatur Land.

3.   The "Davenport Real Estate"

The property labeled as the "Davenport Real Estate" and valued at $0.00 in the Reconciliation remains unsold.  GBG had been trying to sell the property since at least 2007; on the record before me it was listed for sale at $1.9 million.  The property was valued by Defendants' expert David Coles at $1.5 million based on information regarding the value of comparable properties.

Plaintiff argued that the "Davenport Real Estate" should be valued at least at $1.5 million for the purposes of calculating both the LLC's current expected revenues and the liquidating

58

distribution that should have been paid to Old K's.  Defendants argued that because the property had not yet been sold, it has not generated any proceeds that are available for distribution. If the property is sold for an amount sufficient to raise Old K's liquidating distribution above the minimum $3 million distribution, Defendants assert that New K's would at that point pay out an additional distribution to Old K's.[8]

Section 6 of the LLC Agreement governs distributions.  It states that "a distribution made upon a liquidation or winding up of the LLC (the "Liquidating Distribution") shall be made to the members, from all cash or property available for distribution."  LLC Agreement § 6(b).  It specifies that "[e]xcept as the Manager may otherwise determine, all distributions to Members shall be made in cash.  If any assets of the LLC are distributed in kind, such assets shall be distributed on the basis of their fair market value as determined by the Manager."  LLC Agreement § 6(d).

Plaintiff does not contend that liquidation is complete; at a minimum, the Davenport Real Estate remains to be sold.  Under

---

[8] It bears noting that if the Davenport Real Estate generates profits of either $1.5 million or $1.9 million, these profits will be insufficient in themselves to entitle Plaintiff to any additional moneys above and beyond the minimum liquidating distribution already paid.

§ 6(d), GBG, as the manager, could decide to distribute the Davenport Real Estate in kind instead of in cash and to divide the property into 77.5% and 22.5% pieces.  This could enable GBG to complete the liquidation without selling the land.  However, Plaintiff did not contend that GBG was obligated to complete the liquidation immediately and does not claim a right in 22.5% of the Davenport Real Estate in kind.

The LLC Agreement does not require that the Liquidating Distributions be made before liquidation of the LLC is complete. Plaintiff does not and cannot point to any provision of the LLC Agreement that requires New K's to issue such early distributions.  Moreover, Plaintiff does not and cannot point to any provision of the LLC Agreement that requires New K's to make distributions based on estimated future revenues.

Defendant argues that GBG *did* issue liquidating distributions before finishing the winding down and that it *did* calculate those distributions at least in part based on expected revenues and expenses — for example, New K's retained a Reserve fund from Old K's distribution in order to pay projected expenses on behalf of Old K's.  However, New K's might choose to project certain revenues and expenses that seem fairly certain, such as tax preparation fees for Old K's, but choose to wait to issue any additional distributions based on revenues and fees

that seem highly variable, such as the revenues of land sales in a volatile real estate market.  Moreover, New K's can remit to Old K's any unspent remainder of the Reserve Fund at the termination of the liquidation, whereas New K's does not have an enforcement mechanism under the LLC Agreement to collect from Old K's any overpayment of a liquidating distribution made based on an overestimate of the value of currently unsold land.

The LLC Agreement does not require GBG as manager to pay out *any* liquidating distributions prior to the completion of the liquidation.  Therefore, Plaintiff cannot maintain a breach of contract claim where GBG chose to pay out partial liquidating distributions during the course of liquidation and to pay any supplemental distribution necessary after liquidation is complete or after additional revenues become certain.[9]  For these reasons, I granted summary judgment to Defendants on the breach of contract claim to the extent that it is based on the alleged faulty accounting regarding the Davenport Real Estate.

---

[9] Plaintiff does not allege that the distributions were unfair in the sense that New K's paid too high a distribution to GBG when it paid out $3 million (less deductions) to Old K's.  Nor does Plaintiff allege that the early distributions were paid out in such a way that Plaintiff could not eventually receive the total distribution owed to it if it is, after complete liquidation, entitled to an additional partial distribution.

<u>4.</u>   <u>$975,000.00 Held by New K's on Behalf of GBG</u>

The amounts deducted from Old K's liquidating distribution include $975,000.00 that was due to GBG.  The amount was listed as a liability of New K's on the Reconciliation because New K's had not yet distributed the funds to GBG and was holding the monies on its behalf.  Plaintiff contends that it should have also been included as a corresponding asset entry on the Reconciliation and that it was not, artificially reducing the total profit calculation by $975,000.00.

Defendants assert that these moneys were included among New K's assets as listed on the Reconciliation.  Parent submitted an affidavit stating that the $975,000.00 was a part of the "Bank of America Cash" line item, which accounted for a total of $6,817,471.77.

Plaintiff argued that Defendants' sole support for why there was no error in the Reconciliation regarding the $975,000.00 is Parent's declaration and that the declaration is not competent evidence to stave off summary judgment because it is inconsistent with the Reconciliation.  Plaintiff argued that the balance sheet provided within the reconciliation indicates that the Bank of America Cash accounts show only $210,204.19.[10]

---

[10] Plaintiff's briefing states that "[t]he Bank of America Cash accounts listed on the Balance Sheet show only $120,204.19 in cash."  Having checked the balance sheet, I will assume that

Plaintiff argued further that accounts bearing cash in this amount cannot represent an asset of at least $975,000.  However, Plaintiff relates the line in the balance sheet to the wrong asset line in the Reconciliation.  The Reconciliation includes precisely $210,204.19 in the "Bank of America and CIB Cash Account" line item.  This is a distinct line item from the $6,817,471.77 "Bank of America Cash" line item that Parent identifies as the item accounting for the $975,000.00 that New K's was holding for GBG.

Plaintiff also argued that "Parent has failed to present any evidence that the cash account of New K's includes the missing asset entries."  This is untrue. Parent presented an affidavit in which she declared the truth of her statements under penalty of perjury.  "Affidavits are the most conventional means of documenting facts for purposes of advancing, or opposing, summary judgment." *Sheinkopf* v. *Stone*, 927 F.3d 1259, 1262 (1st Cir. 1991).  Defendants have marshaled evidence that the $975,000.00 was properly included within the assets listed in the Reconciliation.  Plaintiff offered no evidence to refute Parent's statements.

---

this is a typo and Plaintiff's counsel meant to value the accounts at $210,204.19.

Plaintiff consequently failed to demonstrate that the
$975,000.00 was improperly omitted from the assets as a matter
of law.  Moreover, Plaintiff failed to raise any evidence based
on which a reasonable jury could resolve the point in its favor.
For these reasons, I granted summary judgment to Defendants on
the breach of contract claim to the extent that it is based on
the alleged faulty accounting regarding the $975,000.00 held by
New K's on behalf of GBG.

### 5.   $100,645.57 Held by New K's as a Reserve

Plaintiff raised similar contentions regarding $100,645.57
deducted from Old K's liquidating distribution, an amount kept as
a "Reserve" being held by New K's for expenses to be paid on
behalf of Old K's, such as annual report and tax preparation
fees.  Plaintiff argues that this $100,645.47 was improperly
listed as a liability instead of an asset on the Reconciliation.

Plaintiff argues that the amount should not have been
included as a liability because it "represented amounts to be
paid back to New K's, not amounts that New K's anticipated paying
out."  However, Plaintiff does not identify any evidence that
indicates that the Reserve is a fund for payments made by New K's
in the past instead of payments anticipated to be made by New K's
in the future such a retrospective use would, of course, be
counterintuitive for a fund labeled as a "reserve").  Parent

64

stated in her affidavit that the $100,645.17 would be spent on "expenses expected to be expended in the future on Old K's behalf," and that to the extent any amounts were left over, it would be repaid to Old K's.  Plaintiff marshals no evidence to counter Parent's affidavit.  As such, it fails to raise a genuine dispute about the issue.

Plaintiff further claims that the amount should be listed as an asset because it is being held by New K's.  Parent stated that the amount is reflected as an asset on the balance sheet and is included within the cash assets listed on the Reconciliation.  Plaintiff marshals no evidence to counter Parent's affidavit.  As such, it failed to raise a genuine dispute on the issue.

For these reasons, I granted summary judgment to Defendants on the breach of contract claim to the extent that it is based on the allegedly improper accounting regarding the $100,645.47 reserve fund.

### 6.   $130,777.53 in Expenses Paid on Behalf of Old K's

The Reconciliation includes a calculation of the payout to Old K's showing deductions for, inter alia, (1) $71,923 for the payment of a settlement with Don Oulette which was paid by New K's and which was to be reimbursed by Old K's, (2) $47,500 in forbearance fees on mortgages for property belonging to Old K's

due to New K's from Old K's, and (3) $11,354.53 in accounts receivable owed to New K's from Kay Eldridge.  Plaintiff contends that these were amounts that New K's anticipated receiving from Old K's and as such should have been listed as assets of New K's.

Parent stated in her affidavit that the $130,777.53 was reflected on the Reconciliation in the cash line item.  She explained that the amount did not increase New K's revenues because the settlement and forbearance fees merely reimbursed New K's for expenses New K's had already paid out on Old K's behalf and the accounts receivable collection simply replaced one asset (accounts receivable) with another asset (cash).  Thus, the amounts were listed in the asset line without increasing New K's gross revenues.

Plaintiff does not explain why the settlement and forbearance fees should be counted as separate assets as opposed to merely credited to the account as reimbursements for payments already made.  Nor does it marshal any evidence indicating that the settlement and forbearance fees were not previously paid on behalf of Old K's or that the reimbursement was not credited to the total assets, such that the prior expenditures were canceled out and the effect of the settlement and reimbursement fees was a wash.  Plaintiff further fails to marshal any evidence that

the accounts receivable sum was not reflected in the cash line item.  Plaintiff fails to raise a genuine dispute on this issue.

For these reasons, I granted summary judgment to Defendants on the breach of contract claim to the extent that it is based on the allegedly improper accounting regarding the $130,777.53 owed by Old K's to New K's.

## F.    *Sanctions Pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927*

Defendants have moved for sanctions pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927 on the basis that Plaintiff's motion for summary judgment had no conceivable likelihood of success, was untenable as a matter of law, and had the effect of multiplying these proceedings unreasonably and vexatiously.

A claim is impermissibly frivolous under Rule 11 when it is "either not well-grounded in fact or unwarranted by existing law."  *Cruz* v. *Savage*, 896 F.2d 626, 632 (1st Cir. 1990).  Rule 11 states:

> By presenting to the court a . . . written motion . . . any attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after inquiry reasonable under the circumstances:
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> (2) the claims, defenses, or other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have

> evidentiary support after a reasonable opportunity for
> further investigation or discovery . . . .

Fed. R. Civ. P. 11(b).  If I find that Plaintiff has violated

Rule 11(b), I may "impose an appropriate sanction on any

attorney [or] law firm . . . that violated the rule or is

responsible for the violation."  Fed. R. Civ. P. 11(c)(1).  The

sanction "must be limited to what suffices to deter repetition

of the conduct or comparable conduct by others similarly

situated."  Fed. R. Civ. P. 11(c)(4).

Rule 11 requires a determination separate from my decision

on the Plaintiff's underlying motion.  "The mere fact that

[Plaintiff]'s arguments proved unavailing does not necessarily

mandate the imposition of Rule 11 sanctions."  *CQ Int'l Co., Inc.*

v. *Rochem Int'l, Inc., USA*, 659 F.3d 53, 61 (1st Cir. 2011).

"[I]n making Rule 11 determinations, judges should not employ

the wisdom of hindsight, but should consider the reasonableness

of the attorney's conduct at the time the attorney acted."  *Cruz*,

896 F.2d at 633.  "Whether a litigant breaches his or her duty

[under Rule 11] to conduct a reasonable inquiry into the facts

and the law depends on the objective reasonableness of the

litigant's conduct under the totality of the circumstances."  *CQ*

*Int'l Co.*, 659 F.3d at 62 (alteration in original).

I do not need to find bad faith on Plaintiff's attorneys'

part in order to subject them to sanctions.  "[S[ubjective good

faith is no[t] . . . enough to protect an attorney from Rule 11 sanctions." *Cruz*, 896 F.2d at 631.  Instead, "[a] violation of Rule 11 . . . might be caused by inexperience, incompetence, willfulness, or deliberate choice."  *Id.*

Sanctions under 28 U.S.C. § 1927 are governed by a somewhat different standard.  Section 1927 states that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  "Behavior is 'vexatious' when it is harassing or annoying, regardless of whether it is intended to be so."  *Cruz*, 896 F.2d at 632.  Thus, "while an attorney's bad faith will always justify sanctions under section 1927, we do not require a finding of subjective bad faith as a predicate to the imposition of sanctions."  *Id.* at 631-32.  "It is enough that an attorney acts in disregard of whether his conduct constitutes harassment or vexation . . . ."  *Id.* at 632 (internal citation omitted).

To be vexatious, the attorney's conduct must "be more than mere negligence, inadvertence, or incompetence."  *Id.*  Sanctions pursuant to § 1927 are available "only when [the attorney's conduct] displays a serious and studied disregard for the orderly process of justice."  *Rossello-Gonzalez* v. *Acevedo-Vilo*,

483 F.3d 1, 7 (1st Cir. 2007).  "[I]n assessing whether an attorney acted unreasonably and vexatiously in multiplying proceedings, the district courts in [the First C]ircuit should apply an objective standard."  *Cruz*, 896 F.2d at 632.

Plaintiff filed a motion for summary judgment on three issues: (1) mismanagement of the furniture department, (2) faulty accounting regarding the alleged missing inventory, and (3) faulty accounting in the Reconciliation.  On none of these issues was Plaintiff's motion warranted by the facts and the law. I will address each in turn.

1.   Mismanagement of the Furniture Department

I did not consider the merits of Plaintiff's claim based on mismanagement of the furniture department above because the claim is based on Defendants' alleged breach of the implied covenant of good faith and fair dealing, and in my August 4, 2011, Memorandum and Order, I stated that "the implied covenant claim fails as a matter of law."  Defendants had moved for an order "dismissing Count III of the complaint, to the extent that it purports to assert a claim for breach of the implied covenant of good faith and fair dealing arising out of the LLC Agreement."  Plaintiff had not raised mismanagement as an independent ground to maintain the claim in its opposition. Despite the motion, briefing, and ruling, Plaintiff nonetheless

filed for summary judgment on the mismanagement claim because the claim was not specifically addressed in the briefing or in my memorandum.  It bears emphasizing that Plaintiff had never raised the argument; consequently, it could not, of course, have been addressed.  I need not consider whether this alone is a basis for sanctions because Plaintiff's argument in favor of summary judgment itself is legally unreasonable.

Plaintiff makes a nonfrivolous, indeed undisputed, argument that the implied covenant of good faith and fair dealing applies where one party is made manager of a business.  "Under Delaware law, the implied covenant of good faith and fair dealing inheres in every contract." *Amirsaleh* v. *Bd. of Trade of City of New York, Inc.*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009). "[T]he implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap* v. *States Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). Here, were GBG intentionally to mismanage the LLC, this would be unreasonable conduct with the effect of preventing Old K's from receiving the fruits of the LLC Agreement.  Although the LLC Agreement did not prescribe detailed requirements for GBG in its management of the LLC, "[g]ood faith limits the exercise of

discretion in performance conferred on one party by the contract." *Bay Center Apartments Owner, LLC* v. *Emery Bay PKI, LLC*, 2009 WL 1124451, at *7 (Del. Ch. April 20, 2009) (quoting Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 372 (1980)).

However, Plaintiff does not and cannot point to any statute or case that makes Defendants' undisputed actions a violation of the implied covenant of good faith and fair dealing *as a matter of law*. It is undisputed that HPG, which was hired by GBG to run New K's furniture department, did not do market surveys or statistical analyses of the furniture department. It is undisputed that HPG established satellite warehouses that cost New K's additional rent. It is undisputed that Geoff Clouser opined that the changes made to the furniture department were unreasonable given the paucity of analysis, that Kay Eldridge opined that the merchandise purchased was scratched and damaged, which was "a terrible thing," and that Richard Powers opined that the merchandise that was brought in was overpriced. However, none of these facts or opinions establishes that the department was mismanaged as a matter of law.

Plaintiff's response to Defendants' motion for sanctions is highly suggestive of the gap in Plaintiff's reasoning. Plaintiff puts forth its evidence that the furniture department was

mismanaged.  It provides citations for that evidence.  It then
states that "[t]here is no dispute that this falls below
reasonable industry standards."  It provides no citation for
that statement; nowhere does the evidence conclusively establish
what acts are required in order to meet reasonable industry
standards in the management of a furniture department.
Plaintiff provides no basis for the conclusion that whatever
decisions GBG and HPG made were mismanagement *as a matter of
law*.  Plaintiff then states that GBG's "actions therefore could
not have been in good faith."  Once again, Plaintiff provides no
citation for that statement; nowhere does the evidence
conclusively establish that the management of the department,
even if it was rife with errors, was the product of Defendants'
lack of good faith.  "[T]o prove bad faith a plaintiff must
demonstrate that the defendant's conduct was motivated by a
culpable mental state."  *Amirsaleh*, 2009 WL 3756700, at *5.
Plaintiff provides no basis for the conclusion that any
mismanagement was not in good faith *as a matter of law*.

    The motion was not "warranted by existing law," Fed. R.
Civ. P. 11, and Plaintiff provides no argument for extending
Delaware state law to provide a basis for its conclusions.

    When I gave Plaintiff leave to file a cross-motion for
summary judgment, I warned that counsel was "advised to consider

73

the application of Fed. R. Civ. P. 11 to any such motion if the motion has no conceivable likelihood of success." Electronic Order of Oct. 7, 2011. Rule 11 "require[s] litigants to 'stop and think' before initially making legal or factual contentions." Fed. R. Civ. P. 11 Advisory Committee's note. Given my warning, counsel should have stopped to think for an extended period of time. If an objectively reasonable attorney had done so, he or she would not have filed a motion for summary judgment on Plaintiff's mismanagement claim. Plaintiff's choice to file this motion, especially after a clear warning, descended to the level of a violation of Fed. R. Civ. P. 11(b).

   2.   Inventory

Plaintiff additionally filed for summary judgment based on the alleged $13.9 million in missing inventory. I did not consider the merits of this claim because I precluded Plaintiff's damages calculation pursuant to Fed. R. Civ. P. 37(c). The preclusion was an exercise of my discretion and Plaintiff's failure to anticipate it does not form the basis for Rule 11 or 28 U.S.C. § 1927 sanctions. However, even if I had allowed the damages calculation and Plaintiff had maintained the claim, Plaintiff's motion for summary judgment based on the claim would still have been unwarranted.

Plaintiff claims that over $13.9 million in inventory was unaccounted for in the Reconciliation and, consequently, in the liquidating distributions.  Plaintiff presents the following evidence: (1) Pakter's June 15, 2010 "Expert Report on Lost Profits of New K's Furniture Department," created using figures from GBG's operating documents that indicate, when plugged into an accounting formula, that $13.9 million in inventory is missing, and (2) a series of emails between various principals at GBG which ambiguously indicate that GBG may have kept more than one set of accounting numbers and may not have shared one of those sets of numbers with Old K's attorney.  GBG opposes Plaintiff's argument with the following evidence: (1) Jeffrey Szafran's November 15, 2010, expert report stating that Pakter's report used the wrong set of GBG data for both the opening inventory and purchase and cost of goods figures and explaining the (non-nefarious and non-fraudulent) difference between the J.D. Edwards data that should have been used and the operating documents data that Pakter used in his formula, and (2) Patricia Parent's affidavit stating much the same thing.

The evidence presented establishes a clear question of fact.  A jury could have determined whether Parent, and any other GBG witness who might testify regarding the same thing, was telling the truth about how the GBG operating documents and

the J.D. Edwards accounting systems numbers were related.  If
the jury were to believe Parent, it would have found that
Pakter's report used the wrong set of data and that his
calculations showing $13.9 million in missing inventory were
faulty, and it would have found in GBG's favor.  If the jury were
to disbelieve Parent and instead agree with Old K's theory that
the J.D. Edwards numbers represented a second set of data
maintained to defraud Old K's, it would have found in Old K's
favor.

Much of Plaintiff's motion for summary judgment was engaged
in an implied motion to strike Szafran's expert report.  However,
even if Szafran's report were not considered, Parent's affidavit
stated the same facts regarding the opening inventory, the GBG
operating documents, and the J.D. Edwards accounting data.
Plaintiff's counsel emphasizes again and again that no documents
exist to support Parent's explanation of the difference between
the data in the J.D. Edwards accounting system and in the GBG
operating documents.[11]  This is an argument for a jury.  Parent's

---

[11] Plaintiff also argues that the LLC Agreement obligated GBG to
maintain complete financial documents, and so there should have
been documents explaining the difference between the GBG
operating documents and the J.D. Edwards data.  That may be so,
but even if GBG failed to keep sufficient accounting documents
in violation with the LLC Agreement, Plaintiff cites no case law
suggesting that this is a reason to exclude testimony by GBG
witnesses explaining what the documents fail to make clear.

affidavit explains why the numbers differ (based on the inclusion of different categories of merchandise in the operating documents and in J.D. Edwards), and whether the lack of supporting documents sufficiently undermines her testimony to render it incredible is a question for a finder of fact.

Had I not precluded Plaintiff's damages calculation under Fed. R. Civ. P. 37(c), Parent's affidavit alone, without supporting documents and without Szafran's report, would have been sufficient to raise a genuine dispute of material fact regarding the inventory issue.  Plaintiff's counsel may claim that, at the time of filing, they could not have known what Parent would state in her affidavit.  Such a claim is difficult to believe.  Szafran made the same statements of fact in his expert report, and employees with personal knowledge of the information (some of whom were his original sources of that information) could be anticipated as likely to submit affidavits that would establish the same dispute.[12]  Moreover, after Parent

---

[12] Notably, when Plaintiff's counsel describes deciding whether to bring this claim in their motion for summary judgment, they state: "We talked to Rick Powers.  We talked to Kay Eldridge.  We talked to our experts.  We searched the J.D. Edwards information."  Plaintiff's counsel does not describe talking to the GBG employees responsible for keeping the financial records.  They do not describe asking Parent, the Managing Director of GBG, to explain the basis for the numbers.  Counsel explains that "[t]he inventory shortfall was found late in discovery and perhaps this is why they did not ask GBG employees about the starting inventory numbers or about how to reconcile the J.D.

submitted her affidavit and after Defendants served the motion

for sanctions, Plaintiff could then have withdrawn its motion

for summary judgment on the issue in recognition of the disputed

facts.  Fed. R. Civ. P. 11 prohibits not only filing but also

"later advocating" for an unwarranted legal claim.  Fed. R. Civ.

P. 11(b).  Plaintiff's counsel chose to maintain the motion for

summary judgment and reply to the opposition in the face of an

affidavit filed establishing a genuine dispute of material fact.

Plaintiff does not and cannot cite to any case law that

establishes that their evidence is superior to Defendants'

evidence as a matter of law.  Objectively reasonable counsel can

be presumed to be aware that a movant is only entitled to

summary judgment when it can show that it "is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

failure to acknowledge a genuine dispute of material fact in the

face of my October 7, 2011, warning to counsel represents

conduct descending to the level of a violation of Fed. R. Civ.

P. 11(b).

### 3.   Accounting in the Reconciliation

I addressed the merits of Plaintiff's motion for summary

---

Edwards data with the data in the GBG operating documents.
However, this does not explain why Plaintiff's counsel would
choose to bring a claim they had not fully investigated as the
basis for part of a motion for summary judgment.

judgment regarding the alleged mistakes in accounting in the
Reconciliation *supra*, Section IV(E).  Plaintiff alleged that the
accounting was faulty with regard to two parcels of land,
certain amounts due from Old K's to GBG and third parties,
certain amounts due from Old K's to New K's in compensation for
amounts previously paid out on Old K's behalf, and accounts
receivable owed to New K's from Kay Eldridge.

As I explain, *supra* Section IV(E), Plaintiff's arguments
have no basis in the evidence or in the case law.

With regard to the claims related to the real estate,
Plaintiff has no legal basis for its claim that the profits and
projected profits were unaccounted for in the Reconciliation in
a way that led to a breach of contract.  The Decatur Land, which
sold after the Reconciliation was created, only generated
$16,705.41 in revenues; these revenues would not raise the total
profits of the LLC above $13,333,333.33 as necessary in order to
increase Old K's liquidating distribution above the $3 million
minimum.  The "Davenport Real Estate" has not yet sold and
Plaintiff can point to no clause within the LLC Agreement that
requires GBG to pay out a liquidating distribution based on an
estimate of estimated future revenues instead of based on actual
revenues (or in-kind distributions) once liquidation is
complete.

With regard to the claims related to the alleged mistaken categorization of certain amounts as liabilities, not as assets, or both, Plaintiff has no factual basis in the evidence presented.  The only evidence regarding the $100,645.57 reserve fund is that it is a fund intended for future expenses (and any remainders will be paid out to Old K's), not that it is a fund for expenses already paid.  Parent stated in her affidavit that the reserve fund, the $975,000.00 held by New K's on behalf of GBG, and the $11,354.53 in accounts receivable owed to New K's from Kay Eldridge were all included as assets within the $6,817,471.77 "Bank of America Cash" line item in the Reconciliation.  She further stated that the amounts to be owed from Old K's to New K's were reimbursements for amounts already paid out and so did not increase the LLC's net revenues.

Plaintiff challenges Parent's affidavit, but its attack on her personal knowledge of the issues was grasping at straws. Further, its complaint that there should have been documentary support of her explanation because of the requirements of the LLC Agreement is unavailing.  It may well be that GBG breached its obligations under the LLC Agreement regarding accounting documentation.  However, such a breach is the grounds of a separate count of breach of contract (one abandoned by Plaintiff) and does not provide a ground to exclude the

testimony of employees explaining the financial documents that were provided, however incomplete those documents may have been.

The parties in this case engaged in the discovery process for approximately two years, during which Plaintiff could have asked GBG deponents whether certain liabilities and deductions were counted as assets, how to reconcile the different accounting documents, and what the sub-parts were of the "Bank of America Cash" line item.  Plaintiff does not cite to any deposition testimony or other evidence indicating that the assets at issue are not included within the "Bank of America Cash" line item in the Reconciliation.  This may well be because the theory was too late conceived by counsel to pursue at depositions (and, evidently, too late conceived or too sloppily litigated to disclose, in terms of damages calculations, to Defendants during the discovery period).  In any event, Defendants are not to be faulted for Plaintiff's inadequate litigation initiatives.

Plaintiff's counsel were no doubt frustrated by confusing financial documents and insufficient documentary explanation. However, lack of clarity is a reason to ask more questions during the discovery phase.  It is not a reason to move for summary judgment.  Plaintiff had no legal grounds to challenge the liquidating distribution as it related to the real estate

and no factual grounds to challenge the liquidating distribution
as it related to the various deductions, liabilities, and assets
discussed above.  Plaintiff's counsel were under an obligation
pursuant to Fed. R. Civ. P. 11 to conduct a reasonable inquiry
before filing and maintaining Plaintiff's motion for summary
judgment, and they did not fulfill that obligation.

    4.   Conclusion

    Plaintiff's counsel filed and maintained Plaintiff's motion
for summary judgment although the claims therein were not
"warranted by existing law or by a nonfrivolous argument for
extending, modifying, or reversing existing law or for
establishing new law."  Fed. R. Civ. P. 11(b).[13]  Pursuant to
Fed. R. Civ. P. 11(c), I order the Plaintiff to pay to
Defendants' the reasonable costs and expenses, including
attorneys' fees, that Defendants incurred in responding to
Plaintiff's motion for summary judgment and in moving for
sanctions.  I direct Defendants to file a detailed calculation
and application for such expenses and fees to this Court on or
before April 1, 2016.  Given the duplicative nature of much in

_____

[13] Because I find that pursuing summary judgment on these grounds
violated Plaintiff's counsels' obligations pursuant to Fed. R.
Civ. P. 11, I need not address whether it also "display[ed] a
serious and studied disregard for the orderly process of
justice," *Rossello-Gonzalez* v. *Acevedo-Vilo,* 483 F.3d 1, 7 (1st
Cir. 2007), in violation of 28 U.S.C. § 1927.

the cross-motions for summary judgment, I remind Defendants that this is not an order for Plaintiff to pay Defendants' fees in prosecuting their own motion for summary judgment.  They should only address fees and costs that would not have been incurred but for Plaintiff's improvident decision to file its own motion for summary judgment.  Plaintiff may file an opposition to Defendants' application for fees and costs on or before April 15, 2016.

## V. CONCLUSION

For the reasons set forth above, I (1) GRANTED Defendants' motion for summary judgment (Dkt. No. 69), (2) DENIED Plaintiff's motion for summary judgment (Dkt. No. 74), and (3) GRANTED IN PART AND DENIED IN PART Defendants' motion for sanctions (Dkt. No. 88).  Defendants shall file on or before April 1, 2016 a detailed calculation and application for sanction expenses and fees.  Plaintiff shall file opposition thereto on or before April 15, 2016.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE